In re Robert E. LEE & Shirley G. Lee, Debtors.

Martin Marietta Materials Southwest, Inc., Plaintiff,

v.

Robert E. Lee & Shirley G. Lee, Defendants.

Atofina Petrochemicals, Inc., Plaintiff,

v.

Robert E. Lee & Shirley G. Lee, Defendants.

Bankruptcy No. 02–54638–C.
Adversary Nos. 02–5229–C, 02–5230–C.

United States Bankruptcy Court, W.D. Texas, San Antonio Division.

April 21, 2004.

James Samuel Wilkins, San Antonio, TX, for Debtors/Defendants Robert E. Lee and Shirley G. Lee.

Randolph N. Osherow, San Antonio, TX, for Trustee.

Patrick H. Autry, Matthews & Branscomb, San Antonio, TX, for Plaintiff Martin Marietta Materials Southwest, Inc.

James J. Johnson, Dallas, TX, for Plaintiff Atofina Petrochemicals, Inc.

### Memorandum Decision on Complaints Objecting to Discharge

LEIF M. CLARK, Bankruptcy Judge.

CAME ON for trial the foregoing matters. This decision constitutes the court's findings of fact and conclusions of law.

### Facts

Robert E. Lee and his wife operated a construction business, R.E.L. Construction, for a number of years. They sold the business in March 1999 to Champion Asphalt Services for $1.5 million.[1] Two creditors of the business, Martin Marietta Materials Southwest, Inc. and Atofina Petrochemicals, Inc., refused to release Robert Lee from his guaranty agreements because the new purchaser was an unknown financial quantity.[2] Champion and its

---

**1.** Lee received no cash at the time he sold the business. The consideration was in the form of a note, payable quarterly. He received payments through 1999, 2000, and 2001.

**2.** At the time of the sale of the company to

principal, Richard Speight, as it turned out, did not do very well with the business. They ended up defaulting first on obligations to Martin Marietta and Atofina, then on the $1.5 million note to Mr. Lee. Ultimately, first R.E.L., and later Champion, filed for bankruptcy. But that comes later.

In January 2001, the debtors acquired what is now their current homestead in Gillespie County, paying $200,000 down and financing the balance of $550,000. The property consists of approximately 122 acres and is rural in character.[3]

In July 2001, Martin Marietta sued the Lees on their guaranty. The following October 2001, Atofina also sued the Lees on their guaranty.[4] Initially, Mr. Lee relied on Mr. Lee Elms, his long-time lawyer and friend, to defend these suits, but later, the Lees substituted another attorney, Shawn Fitzpatrick. Mr. Fitzpatrick vigorously defended the Lees in both suits, maintaining, in the case of Martin Marietta that the guaranty signed by Mr. Lee ran in favor of a different company (perhaps a predecessor entity).[5]

██ Meanwhile, all was not going well with Champion. Rumors of Champion's financial difficulties were widespread, though Mr. Speight reassured Mr. Lee that contracts in the pipeline would assuredly help the company turn the corner. Though Champion had been regular in its quarterly payments to Lee since late 1999, the payment in December 2001 turned out to be the last one Champion would make.[6] This note income had been the Lees' principal source of income (they had sold the business and planned to retire to live off the proceeds of the note from the sale). Other than this income, they had only their investments, and their Social Security (about $2,400 a month between the two of them). Their mortgage payment on the Gillespie County property alone was approximately $4,000. Anticipating that their income might be in jeopardy, the Lees, beginning in October 2001, started to liquidate their investment portfolio.[7] In

Champion Asphalt, the company was current with both Martin Marietta and Atofina Petrochemical.

3. Atofina objected to the debtors' exemption claim, but that objection was overruled earlier in the case.

4. Atofina had previously made demand on Lee, but only by letter sent to the business address. Lee was only there as a consultant on occasion, and did not receive mail there. Atofina vigorously maintains that they also spoke with Lee, but the evidence on this point is conflicting. Atofina initially sued Lee in Harris County, Texas, but had to nonsuit and refile in Bexar County. It is not clear whether the original suit was in fact served on Mr. Lee.

5. How vigorously is indicated by the fact that Fitzpatrick filed a motion for rehearing after summary judgment was ultimately rendered in favor of Martin Marietta, then filed a notice of appeal. The appeal was live even after the Lees filed bankruptcy, and the chapter 7 trustee retained Mr. Fitzpatrick to continue to represent the estate's interest in this appeal.

6. The note payments were due quarterly. According to Lee, he expected to receive the next quarterly payment, having received assurances from Richard Speight that the business would be turning around with some jobs that were in the pipeline. However, other activities by Lee, detailed later, suggest that Lee anticipated that Champion Asphalt would not be able to make any further payments. In addition, by this time, Lee had already been sued by both Atofina and Martin Marietta on his guaranty agreements, for bills left unpaid by Champion Asphalt.

7. According to Lee, he was motivated to liquidate his investments at least in part based upon his belief that the market would not do well in a Republican administration. The court takes judicial notice that, after September 11, 2001, the market suffered significant losses. His other motivation was his doubts about the ability of Champion to continue to

the year that immediately preceded the bankruptcy, the Lees liquidated nearly $400,000 in stocks, bonds and mutual funds (virtually all of which was non-exempt under Texas law). Of that amount, $254,000 was used to pay down the mortgage on the Gillespie County property. In early 2002, the debtors withdrew approximately $56,000 in cash from their checking account, using the money for repairs to their homestead and to live on.[8]

Sometime in late 2001 or early 2002, the Lees, with the assistance of their lawyer and long-time friend, Lee Elms, decided to sell the property located at 9960 Braun Road,[9] with a view to applying the proceeds to pay off the mortgage on their Gillespie County homestead, in the face of the pending guaranty lawsuits. Mr. Elms actually structured the arrangement. First he had the Lees transfer the Braun Road property to an entity known as the R.E. Lee Family Limited Partnership, an entity formed in 1999 and controlled by the Lees.[10] On the same day, he arranged for the partnership to sell the property to another entity, St. Andrews Enterprises, Inc., an entity owned and controlled by Mr. Elms.[11] The family partnership took back a note for $350,000, secured by the Braun Road property, and payable in July 2002. The general instruction from Mr. Lee to Mr. Elms was to "get the property sold" with the understanding that the proceeds would be used to pay off the mortgage on the Gillespie County homestead. It was Elms, however, not Lee, who thought up the precise structure. Lee did not know of St. Andrews' involvement until the day he came to Elms' office to sign the paperwork.

The testimony regarding the motivation for this transaction was, as one would expect, conflicting, but multiple reasons seem to have fed into the decision to take action at this point in time. First of all, the Lees, beginning in December at the latest (and perhaps as early as October), realized that they might no longer have the regular income to continue to service the mortgage on their homestead. Second, Mr. Lee had been entertaining offers from Richard Speight to buy the Braun Road property for $350,000 for some time (the property was where Speight ran the business, under lease from Lee), but had been unable to

make its payments, the loss of their income as consultant (Mr. Lee) and employee (Mrs. Lee) in the fall of 2001, and the need of Mrs. Lee to get knee replacement surgery. In testimony, Mr. Lee described his liquidation activity as part of "Plan B" to pay for his homestead, in light of the substantial risk that Champion would no longer be paying him any money due to their financial problems.

8. Lee testified that he used $30,000 to $40,000 of this money to pay for repairs, though he did not have receipts. Much of these payments, he said, were to day laborers who normally expected to be paid in cash, and who did not give receipts. According to Lee, he hired a "jefe" (a boss) who would in turn find the day laborers to do the work. He says he gave the work boss the money, who in turn paid the laborers. The balance of the cash withdrawn was used to live on.

9. This is where the business of R.E.L. Construction had been, and where Champion Asphalt was currently operating, under a lease with Mr. Lee. Evidently, Richard Speight had been talking about buying the property from Lee for the previous year, for $350,000, but had thus far been unable to consummate the transaction.

10. The family partnership had never been "activated," *i.e.*, no assets had up to that time actually been placed into the partnership.

11. St. Andrews Enterprises was formed in 1991, ostensibly to acquire properties for resale. It never actually acquired any properties, however, until this transaction. The company is still in existence, and periodically bids on properties, though it has not acquired any properties since the Braun Road transaction.

actually perform. With Champion Asphalt now on apparently shaky ground, selling the property to someone else, with a view to raising enough cash to pay off the homestead note (before they ran out of income), looked like a good idea (Mr. Lee described this as "Plan B" for getting their home paid off). The pending litigation (and the possibility that it might interfere with "Plan B") no doubt figured into Lee's conversations with Mr. Elms as to how best to structure things. Storm damage to the Gillespie County property was part of the reason for pulling cash out of the checking account in January and February 2002.

Later in February, 2002, the Lees transferred five other, smaller tracts of non-exempt real property into the family partnership, ostensibly to formally activate the family partnership. The original family partnership agreement, executed in 1999, contemplated the transfer of both these five tracts and the Braun Road property into the partnership, but Lee explained that family issues delayed the implementation.

The litigation, meanwhile, proceeded. As earlier noted, Lee's attorney mounted a vigorous defense especially against Martin Marietta, challenging the validity of the obligation. However, in June 2002, summary judgment was granted to Atofina, giving that entity a judgment for over $320,000. In July 2002, a similar judgment was given to Martin Marietta in its lawsuit, this one for almost $269,000. Further litigation proceeded, however, with Lee's attorney appealing the Martin Marietta judgment.

In August 2002, St. Andrews Enterprises happened upon a buyer for the Braun Road property. Homer J. Stoerbeck purchased the property for $375,000, intending to operate his trucking business from there. Stoerbeck is a true disinterested third party. The sale closed in mid-August, with $297,000 of the proceeds being immediately disbursed to the family partnership. The family partnership, in turn used $267,000 of that amount to immediately retire the mortgage on the Gillespie County property.

On September 27, 2002, with collection action closing in on them, the Lees filed their chapter 7 bankruptcy petition.[12] After filing, they filed a set of bankruptcy schedules on October 16, 2002. Their schedules were further amended on January 27, 2003. The original schedules disclosed the debtors' interest in the family limited partnership. The statement of affairs disclosed the transfer of the Braun Road property into the family partnership, its further transfer into St. Andrews, and its eventual sale to Homer Stoerbeck. They also there disclosed the transfer of the five other lots into their family limited partnership. The statement of affairs also disclosed the payoff of their mortgage by the family partnership. Later amended schedules did not substantively modify the original schedules.

### Activities During the Bankruptcy Case

After filing their schedules, the debtors appeared at the first meeting of creditors, and answered questions posed both by the trustee and by Atofina and Martin Marietta. They amended their schedules in February 2003. Both Atofina and Martin Marietta timely filed adversary proceed-

---

12. Lee denied that he had been contemplating bankruptcy, stating that he and his wife did not make that decision until shortly before they actually filed. Their bank records show that the first disbursement to bankruptcy counsel was made only days before his actual filing. On the other hand, Mr. Elms is an accomplished creditors' rights lawyer. Elms appears to have been the architect of the arrangement by which the Braun Road property was placed into St. Andrews Enterprises and later sold.

ings, objecting to the debtors' entitlement to a discharge. Atofina claimed that their discharge should be denied for the following reasons: (1) under § 727(a)(2), the debtors, with alleged intent to hinder, delay or defraud an existing creditor, converted non-exempt property into exempt property via the series of transactions involving the Braun Road property, as well as the liquidation of non-exempt investments; (2) under § 727(a)(2), the debtors allegedly concealed their interest in the family limited partnership during the course of the bankruptcy; (3) under § 727(a)(3), the debtors allegedly failed to maintain records from which the use of some $56,000 in withdrawals from their checking account could be determined; (4) under § 727(a)(4), the debtors allegedly made a false oath in their schedules, which failed to disclose their alleged ownership interest in a family trust bank account or to properly value their stock in Somerset State Bank, (5) under § 727(a)(5), the debtors allegedly failed to satisfactorily explain the dissipation of their assets; and (6) under § 727(a)(7), the actions of Mr. Lee must be attributed to Mrs. Lee, who is an insider (and vice-versa).

Martin Marietta, in a considerably less strident complaint, simply asked for the debtors' discharge to be denied because of (a) the above-described prebankruptcy planning constitutes acts to hinder, delay or defraud a creditor within one year of filing, warranting denial of discharge under § 727(a)(2), (b) the debtors' alleged failure to maintain records regarding the disposition of various cash withdrawals from their bank accounts, totaling $56,000 or so, warrants denial of discharge under § 727(a)(3), and (c) the alleged failure to explain the disposition of those cash withdrawals warrants denial of discharge under § 727(a)(5).

The two adversary proceedings were consolidated for trial, as the facts essential to the court's determination would be essentially the same. After trial, the court sought and obtained post-trial briefing on the issue of the nature of extrinsic evidence necessary to demonstrate actual intent to hinder, delay or defraud creditors under § 727(a)(2).

## Analysis

During a trial on a complaint objecting to a debtor's discharge, the plaintiff bears the burden of proof, as well as the initial burden of going forward with evidence. *See* FED.R.BANKR.P. 4005. In this case, the creditors, Marietta and Atofina, bear the burden of proof in their complaint objecting to the discharge of the debtors on these four grounds: (a) section 727(a)(4); (b) section 727(a)(3); (c) section 727(a)(5); and (d) section 727(a)(2). If the evidence establishes any one of these grounds, then the burden shifts to the debtors to put forth evidence explaining their conduct. *See In re Perez*, 954 F.2d 1026, 1027 (5th Cir.1992). Because the purpose of Chapter 7 of the Code is to give honest debtors a "fresh start" via the discharge, the provisions of section 727(a) are to be liberally construed in favor of debtors, and strictly construed against the party objecting to discharge. Courts should deny discharge only for very specific and serious infractions. *See, e.g., In re Ichinose*, 946 F.2d 1169, 1172 (5th Cir.1991); *see also In re Jones*, 292 B.R. 555, 559 (Bankr.E.D.Tex.2003); *In re Reed*, 11 B.R. 683, 685 (Bankr.N.D.Tex.1981).

The creditors, between them, urged denial of discharge on four grounds, each of which must be examined, with the foregoing principles in mind.

### A. § 727(a)(4):

#### 1. *Discharge Standard Under § 727(a)(4)(A):*

Section 727(a)(4)(A) states, as a basis for denial of discharge, a finding that

the "debtor knowingly and fraudulently, in or in connection with the case ... made a false oath or account." 11 U.S.C. § 727(a)(4)(A). The party objecting to the debtor's discharge under this section has the burden to show by a preponderance of the evidence that: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case. *See Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir.1992); *see also Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 660, 112 L.Ed.2d 755 (1991). False oaths sufficient to justify the denial of discharge under section 727(a)(4)(A) include: (1) a false statement or omission in the debtor's schedules or (2) a false statement by the debtor at the examination during the course of the proceedings. *See Beaubouef*, 966 F.2d at 178; *see also* 4 COLLIER ON BANKRUPTCY ¶¶ 727.04[1], at 727–59 (15th ed.1992). A discharge cannot be denied when items are omitted from the schedules by honest mistake. *See Beaubouef*, 966 F.2d at 178; *see also* 4 COLLIER ON BANKRUPTCY ¶¶ 727.04[1A]. However, the existence of more than one falsehood, together with a debtor's failure to take advantage of the opportunity to clear up all inconsistencies and omissions, such as when filing amended schedules, can be found to constitute reckless indifference to the truth satisfying the requisite finding of intent to deceive. *See Beaubouef*, 966 F.2d at 178; *see also In re Sanders*, 128 B.R. 963, 972 (Bankr.W.D.La.1991).

## 2. § 727(a)(4)(A) Analysis:

 With regard to the various contentions regarding the failure of the debtors to file accurate schedules and thereby risking loss of their discharge under § 727(a)(4), the court finds that this objec-

tion should be overruled. The debtors' original schedules reflected their ownership interest in the assets to which objection was made. They also fully described the entire Braun Road transaction, as well as the contribution of the five lots into the family partnership. As it turned out, the debtors arranged for those properties to be surrendered to the trustee without requiring the trustee to file an avoidance action, and those properties were subsequently sold by the trustee for the benefit of creditors.

Atofina attempted to show that the debtors had not properly disclosed their ownership interest in certain bank accounts, but presented insufficient evidence at trial to sustain the contention.

The debtors, in short, did not falsify their schedules.

For the above reasons, the court rules that the creditors' objection to discharge based on a false oath under section 727(a)(4) is not sustained.

## B. §§ 727(a)(3) and (5):

### 1. Discharge Standard Under § 727(a)(3):

 In order to state a *prima facie* case under § 727(a)(3), the party objecting to discharge bears the initial burden to prove (1) that the debtors failed to keep and preserve their financial records and (2) that this failure prevented the party from ascertaining the debtors' financial condition. *See Robertson v. Dennis (In re Dennis)*, 330 F.3d 696, 703 (5th Cir.2003). Though a debtor's financial records need not contain "full detail", "there should be written evidence" of the debtor's financial condition. *See Goff v. Russell Co. (In re Goff)*, 495 F.2d 199, 201 (5th Cir.1974); *see also In re Kottwitz*, 42 B.R. 566, 569–70 (Bankr.W.D.Mo.1984) (stating that, while the debtor's records need not be "abso-

lutely perfect", they must be kept in an "intelligent fashion"; the court retains wide discretion to determine whether they are sufficient).

If the party objecting to discharge, the creditors here, satisfies its burden, the debtors then have the burden to prove that the inadequacy, or their failure to keep adequate records, is "justified under all the circumstances" of the case. *Dennis*, 330 F.3d at 703; *see also* 11 U.S.C. § 727(a)(3). The debtor's records must at least reasonably allow for reconstruction of the debtor's financial condition to meet the requirements of the Code. *See, e.g., In re Dias*, 95 B.R. 419, 422 (Bankr. N.D.Tex.1988). The bankruptcy court has wide discretion in both inquiries, *i.e.,* whether the movants have satisfied their burden of proof and whether the debtors have justified their failure. The court's findings in this regard are reviewed only for clear error. *Dennis*, 330 F.3d at 703; *Goff*, 495 F.2d at 202.

### 2. *Discharge Standard Under § 727(a)(5):*

Section 727(a)(5) states, as a ground for denial of discharge, that the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities. 11 U.S.C. § 727(a)(5). The burden of proof rests with the party objecting to discharge. *See In re Reed*, 700 F.2d 986, 992 (5th Cir.1983). Thus, the creditors have the burden of proof, and the ultimate burden of persuasion to prove by a preponderance of the evidence that the discharge should be denied on this ground. *See id.* at 992–93; *see also In re Sanders*, 128 B.R. 963, 974 (Bankr.W.D.La.1991). However, a creditor's mere allegation that there is a lack of an adequate explanation for the loss of assets does not make the

*prima facie* case. *See Sanders*, 128 B.R. at 974; *see also In re Martin*, 698 F.2d 883, 886–887 (7th Cir.1983). The creditors must prove which assets are "missing" to make a *prima facie* case. *See Sanders*, 128 B.R. at 974.

If the objecting creditors can make out the *prima facie* case regarding loss of assets, the burden then shifts to the debtors to provide a satisfactory explanation for that loss. *See id.; see also In re Chalik*, 748 F.2d 616, 619 (11th Cir.1984). If a debtor's explanation is that his cash assets were dissipated, for example by gambling them away, but lacks documentation, corroboration, or substantiation of such claimed gambling losses, a court could justifiably conclude that that evidence is not sufficient to explain the loss. *See In re Wo*, 1991 WL 329579, at *2 (S.D.Tex.1991). An explanation that is vague and unsupported, albeit convenient, is not satisfactory. *See, e.g., In re Gallini*, 96 B.R. 491 (Bankr.M.D.Pa.1989).

### 3. *§§ 727(a)(3) and (5) Analysis:*

The creditors' objection under this section relates to the same factual evidence. The factual allegation is that the debtors failed to satisfactorily explain the disposition of some $56,000 in cash withdrawals from their checking account during early 2002.

The testimony of the debtors at trial showed that, by late 2001, the debtors had started to liquidate their investments, that they no longer had a regular source of income (at least not after the last payment on the $1.5 million note from Champion Asphalt), that they had a regular monthly mortgage obligation of over $4,000 a month on the Gillespie County homestead, that they were anticipating medical expenses for knee replacement for Mrs. Lee, that they were living on rural property on which they raised goats, that the property

had suffered some damage from storms and a tornado, and that they were retired. In January and February of 2002, Mr. Lee made a series of large cash withdrawals from his investment accounts.[13] He explained in deposition and at trial that he used this cash to make repairs to his Gillespie County property, paying workmen in cash. He also added that it had been his practice for many years to keep large sums of cash on hand.

Section 727(a)(3), by its terms, imposes risk of discharge for failure to keep or preserve recorded information from which a debtor's financial condition might be ascertained, unless that failure "was justified under all of the circumstances of the case." Needless to say, the determination of what counts as justification is fact-specific, and is hardly subject to a brightline rule. The Fifth Circuit ruled in *In re Dennis* that the objecting party must show a lack of financial records from which the financial condition of the debtor could be determined. *See In re Dennis,* 330 F.3d 696, 703 (5th Cir.2003). If that burden is sustained, then it is up to the debtor to show that circumstances of the debtor were such that any failure to keep records was justified under all the circumstances. *See id.*

At trial, the debtors produced checking account records to substantiate deposits and payments. They also produced tax returns. Lee did not furnish any further documentation of his disposition or use of the cash withdrawals made in January and February of 2002. The creditors argue that the debtors failure to substantiate just

how they spent this cash justifies their losing their discharge.

Mr. Lee explained that he in fact has always kept a good deal of cash around (as much as $20,000 to $30,000 at any given time), and that much of that money was used to make repairs caused by a tornado and a later flood. Mr. Lee claimed that most of the repair work was done by day-laborers who expected to be paid in cash, and who did not invoice him for their work.

Both creditors maintain that this explanation is insufficient, citing to *In re Reed,* 700 F.2d 986, 992–93 (5th Cir.1983). There, the debtor, when pressed on the disposition of some $19,000 in cash, responded that he always carried large amounts of cash, that he had many business and home expenses, and that he lost some of it gambling in Las Vegas. The circuit court affirmed as not clearly erroneous the bankruptcy judge's conclusion that this explanation was not satisfactory.[14]

There are echoes of *Reed* in Mr. Lee's explanation. Like Mr. Reed, he professes to routinely carry large amounts of cash. Like Reed, he cannot account for where all of the money went, or verify that it was used as he says it was, in this case to pay day laborers. Yet, unlike Mr. Reed, Mr. Lee was not pulling the cash out of his business. The money came from liquidating his investments, for reasons that are not necessarily linked to the pending lawsuits by these creditors, and certainly not in contemplation of bankruptcy. Mr. Lee's testimony to the effect that he spent a

**13.** Each of the withdrawals was for about $6,000.

**14.** The court in *Reed* cited an old Fifth Circuit case decided under the Act that talked about what counts as "satisfactory." Here is the quoted language:
The word "satisfactorily" ... may mean reasonable, or it may mean that the court, after having heard the excuse, the explana-

tion, has that mental attitude which finds contentment in saying that he believes the explanation—he believes what the bankrupts say with reference to the disappearance or shortage. He is satisfied. He no longer wonders. He is contented.
*In re Shapiro & Ornish,* 37 F.2d 403, 406 (N.D.Tex.1929).

considerable portion of these cash withdrawals on day laborers is credible. He explained that he hired what he described as "a jefe" (or boss) whose job it was to go find day laborers to make the repairs to the damage caused by flood waters and a tornado, and that he gave this work boss cash which he in turn used to pay the day laborers. This is a practice that is not uncommon in South Texas. Nor is it uncommon that such work is done without formal documentation.[15]

Mr. Lee also anticipated some medical expenses for his wife for knee replacement, and neither was certain if the procedure would be covered by insurance or Medicare at the time.

The record also reflects that, after these withdrawals, the bank account from which the withdrawals came still held a substantial amount of cash, and the debtors put money back in, making a deposit of over $27,500 in mid-February and nearly $13,200 in March.[16]

The court finds that testimony credible, and consistent with the way some people (especially older, wealthier people who have retired) operate. Certainly, a person not contemplating bankruptcy at the time who has such work done would have little reason to document such work—there is unlikely to be any particular tax reason for keeping records[17] and certainly no other reason to maintain a record of expenditures as the Lees are (and were at the time) retired. The fact that the Lees had implemented Plan B at this point, with a view to securing their homestead against upcoming vicissitudes (be it litigation or just the lack of steady income), supports the timing of the withdrawals, and the fact that deposits were made right back into the very same account demonstrates that the Lees were not trying to "drain the account" in contemplation of collection action. The court is contented with these explanations.

For these reasons, the court concludes that discharge should not be denied based on section 727(a)(3).

■■■ Nor should it be denied based on section 727(a)(5). That section functions in tandem with section 727(a)(3), denying discharge to one who fails to satisfactorily explain the loss of one's assets so as to be able to satisfy creditor claims. The same facts that satisfied the inquiry under section 727(a)(3) also satisfy the inquiry under section 727(a)(5). The debtor adequately explained what happened to the money that was withdrawn from his bank account. If the debtor was left, at the end of the day, with insufficient money to satisfy Atofina and Martin Marietta, it was not because no one knew where the money went—everyone knew exactly where the

---

**15.** Consider the more urban examples with which many are familiar: yard work, tree trimming, child care, pool cleaning. Translate the same dynamic into a rural and ranch setting. To the court, this explanation has the ring of truth, and the demeanor of Mr. Lee in his testimony hardly bore the lack of candor or cavalier attitude that, according to the bankruptcy judge, evidently marked Mr. Reed's testimony. *See In re Reed,* 700 F.2d, at 989.

**16.** The suspicion laying behind the failure to account for monies is that the monies have been somehow secreted away in some hidey-

hole, to be retrieved later when all this blows over. Yet depositing such large sums back into the same account belies such an intent.

**17.** Save, of course, for the duty to report payments via a Form 1099. The court has no call to rule on whether Mr. Lee should have followed the tax laws—the matter before the court is whether he should have maintained records for the benefit of creditors, not for the benefit of the Internal Revenue Service. For good or ill, Mr. Lee's behavior is, no doubt, repeated thousands of times every day in Texas alone.

money went: into the Gillespie County homestead. An action under section 727(a)(5) is thus not established.

## C. § 727(a)(2):

### 1. *Discharge Standard Under § 727(a)(2): Transfers with Intent to Defraud:*

Under section 727(a)(2), the bankruptcy court may deny a debtor a discharge on a showing that "the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred ... or has permitted to be transferred, ...—(A) property of the debtor, within one year before the date of the filing of the petition; or (B) property of the estate, after the date of the filing of the petition." 11 U.S.C. § 727(a)(2); *see also In re Dennis*, 330 F.3d 696, 701 (5th Cir.2003). In this case, because there are no allegations under section 727(a)(2)(B), the only relevant provision is section 727(a)(2)(A).

▮▮▮▮▮ The purpose of section 727(a)(2)(A) "is to deny a discharge to those debtors who, *intending to defraud,* transfer property which would have become property of the bankrupt estate." *Pavy v. Chastant (In re Chastant)*, 873 F.2d 89, 90 (5th Cir.1989) (emphasis added). A party objecting to a discharge under § 727(a)(2)(A) must prove that there was: "(1) a transfer of property; (2) belonging to the debtor; (3) within one year of the filing of the petition; (4) with actual intent to hinder, delay or defraud a creditor." *Dennis*, 330 F.3d 696, 701 (5th Cir. 2003) (quoting *Chastant*, 873 F.2d at 90). The bankruptcy court's determination that a debtor did or did not have the requisite intent to hinder, delay or defraud is a factual finding. *See id.* The movants, the creditors here, bear the burden to prove the debtors' intent to defraud. *See Chas-*

*tant*, 873 F.2d at 90–91. Furthermore, "evidence of actual intent to defraud creditors is required to support a finding sufficient to deny a discharge [and] [c]onstructive intent is insufficient." *Id.* at 91.

### 2. *§ 727(a)(2) Analysis:*

The true centerpiece of the dispute in this adversary proceeding is the carefully structured transaction whereby the Braun Road property, which was non-exempt property, was, in the words of Atofina, "transmogrified" into exempt property. The debtors used the proceeds from the sale of the Braun Road property (after it had been transferred into a bankruptcy-remote entity) to pay off the mortgage on the Gillespie County homestead, leaving them with exempt property unencumbered by any liens. The debtors also liquidated non-exempt investments, and applied part of the proceeds to pay down the mortgage on their exempt homestead. Monies that could have been used to satisfy other creditors were instead used to satisfy a particular creditor which had a lien on an exempt asset. Both Atofina and Martin Marietta claim that these activities prove that the debtor acted with intent to hinder, delay or defraud at least two creditors, Atofina and Martin Marietta, both of which were in the midst of suing Mr. Lee at the time.

There can be no doubt whatsoever regarding the debtors' basic intent. The debtors chose to maximize the value of their exempt property by selling non-exempt property and using the proceeds to pay off liens on their exempt property, a course of action that both assured them of a homestead free from the reach of creditors, and rendering them essentially judgment-proof. The debtors knew that, at their age, and at the rate they were burning through their other investment assets, and now assured that they would never see

another dime from the sale of Mr. Lee's business, there was a good chance that they would not be able to maintain the mortgage on their homestead. Thus, they were likely not only to be rendered penniless by the pending lawsuits, but also destitute (and homeless) through the loss of their homestead to eventual foreclosure. With counsel and assistance from their long-time friend and lawyer, Lee Elms, they took action to maximize their exemptions, at what it turns out was the expense of their creditors.

The legal question the foregoing recitation invariably raises, then, is this: to what extent, if any, does such overt exemption planning violate the strictures of section 727(a)(2)? There are many cases in which debtors have lost their discharge on similar facts. *See In re Reed,* 700 F.2d 986 (5th Cir.1983); *In re Swift,* 3 F.3d 929 (5th Cir.1993); *cf. In re Bowyer,* 932 F.2d 1100 (5th Cir.1991). The debtors, however, point this court to a decision by a bankruptcy court in Arizona, which carefully distinguished an intent to hinder, delay and defraud, on the one hand, and an intent to maximize one's legitimate exemptions, on the other. *See In re Crater,* 286 B.R. 756 (Bankr.D.Ariz.2002); *see also In re Bowyer, supra; In re Smiley,* 864 F.2d 562 (7th Cir.1989).

The *Crater* case is important to this analysis not because of its precedential weight (as a trial decision from a different circuit, it has essentially no binding effect

in this proceeding), but rather because of its persuasive logic. Judge Randolph J. Haines carefully analyzes the case law that has developed across several circuits in an effort to derive a coherent rule of law to replace what has, over the years, become an essentially *ad hoc* inquiry. He concludes that the best rule is one which does not penalize bankruptcy exemption planning *per se,* and restricts the application of section 727(a)(2) to situations in which there is extrinsic evidence of fraudulent intent, apart from the intent to maximize one's exemptions. His close examination of the case law leads him to believe that that approach is essentially consistent with the approaches taken in the Seventh,[18] Tenth,[19] Fifth[20] and Fourth[21] Circuits (with some *caveats*), though it is inconsistent with the approach taken in the Eighth Circuit.[22] The Ninth Circuit, he noted, had not ruled directly on the question in the Code context, though pre-Code decisions, in his view, were consistent as well with the rule he proposed.[23]

This court is, of course, bound by the precedent developed within this circuit, and is not so free to write on a clean slate as was Judge Haines. Nonetheless, his explication of Fifth Circuit decisions is accurate. He notes firstly that all circuit decisions on this question must be viewed against the backdrop of the standard of review. An evaluation of intent is necessarily fact-intensive and must involve credibility determinations that are not dis-

---

**18.** *See Smiley v. First Nat'l Bank of Belleville (In re Smiley),* 864 F.2d 562 (7th Cir.1989).

**19.** *See Marine Midland Bus. Loans, Inc. v. Carey,* 938 F.2d 1073 (10th Cir.1991).

**20.** *See First Texas Sav. Assoc., Inc. v. Reed (In re Reed),* 700 F.2d 986 (5th Cir.1983).

**21.** *See Ford v. Poston (In re Ford),* 773 F.2d 52 (4th Cir.1985).

**22.** *See Norwest Bank Nebraska, N.A. v. Tveten,* 848 F.2d 871 (8th Cir.1988); *see also Hanson v. First Nat'l Bank in Brookings,* 848 F.2d 866 (8th Cir.1988).

**23.** *See Wudrick v. Clements,* 451 F.2d 988 (9th Cir.1971) (upholding exemption for money borrowed against unencumbered vehicles and placed into a credit union where it was exempt under California law).

turbed on appeal absent clear error. Thus, the holding of each circuit court decision is limited to a considerable extent by the state of the record and the factual findings made below. In *Reed*, for example, Judge Haines points out that the trial court had found the requisite intent. On appeal, the circuit court could not have reversed that factual finding absent a showing of clear error (and clear error almost never means second-guessing the trial court judge's credibility determinations). He points out as well that the circuit court affirmed the trial court's conclusion not because the debtor had converted non-exempt assets into exempt assets, but because the lower court had found that the debtor had done so *with fraudulent intent.* The Fifth Circuit in *Reed* said: "While prebankruptcy conversion of nonexempt into exempt assets is frequently motivated by the intent to put those assets beyond the reach of creditors which is, after all, the function of an exemption, *evidence of actual intent to defraud* creditors is required to support a finding sufficient to deny a discharge." *Reed,* 700 F.2d, at 991 (emphasis added). Judge Haines in *Crater* also noted that a rule that somehow "criminalizes" exemption planning *per se* (or even on the basis of its extent) misses the point of section 727(a)(2) and engrafts via case law a prohibition which Congress itself expressly rejected when it enacted the Code.[24] He adds that exemptions, by their very nature, frustrate the ability of creditors to collect on their claims, yet legislatures (both state and federal) have elected to balance the

interests of creditors in getting paid against the need to prevent debtors from being rendered essentially destitute by being deprived of the means to live in the face of creditor claims. *See Crater,* 286 B.R., at 761–62.[25] What is more, when a debtor elects to liquidate a given asset, and to use the proceeds to satisfy a claim on exempt assets rather than to satisfy other claims, the debtor has not committed fraud. The decision to prefer one creditor over another always of necessity hinders or delays payment to other creditors, but is not, as a matter of law, fraudulent in and of itself. *See id.*

■ Judge Haines also discusses *In re Bowyer,* in which the Fifth Circuit (on reflection) decided to affirm the lower court's ruling that the debtor there should not lose his discharge, even though the debtor had converted nonexempt assets into cash, and used part of the money to repair his home. Again, two points emerge: the essential finding of actual intent arises from facts independent of the simple act of converting nonexempt into exempt assets, and that inquiry is, in turn, dependent on the credibility determinations of the trial judge. *See Bowyer,* 932 F.2d, at 1102–03. The ruling on rehearing rejected the notion that the word "defraud" in the phrase "hinder, delay, or defraud" be read separately. Instead, mere actions to hinder or delay, absent showing of an intent to defraud as well, is insufficient to make the showing under section 727(a)(2).

---

24. The House Report to the Bankruptcy Reform Act of 1978 stated:
 As under current law, the debtor will be permitted to convert nonexempt property into exempt property before filing of the bankruptcy petition. This practice *is not* fraudulent as to creditors, and permits the debtor to make full use of the exemptions to which he is entitled under the law.

H.R. REP. No. 95–595, at 261 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5953, 6317 (emphasis in original).

25. *See also In re Leva,* 96 B.R. 723, 727–28 (Bankr.W.D.Tex.1989) (discussing the policy behind the enactment of exemption laws in Texas).

Any time a debtor converts nonexempt property into exempt property, the activity will have the inevitable effect of hindering and delaying at least some creditors. A rule of law that excused an objecting party from showing intent to defraud independent of the intent to hinder or delay (that is, after all, the point of acquiring an exempt asset with nonexempt property) would mean that *any* exemption acquisition with nonexempt property within one year of filing would, as a matter of law, automatically disqualify the debtor from receiving a discharge. Judge Barksdale's dissent in *Bowyer* urged precisely such a rule. It was rejected.[26]

■ Judge Haines does not discuss another Fifth Circuit case, *In re Swift*, 3 F.3d 929 (5th Cir.1993), a case which originally arose in this court. There, the circuit court affirmed the trial court's findings as not clearly erroneous, and ruled that the debtor indeed should be denied his discharge, due to prebankruptcy transactions found by the trial court to be fraudulent. The court took pains to detail the activities which motivated the lower court's ruling, in the evident hope that, in doing so, it might guide future decisions. Still, the court concluded that, "[u]nfortunately, the line between legitimate pre-

bankruptcy planning and intent to defraud creditors contrary to section 727(a)(2) is not clear." *Swift*, 3 F.3d at 931. The court thus acknowledged that the rule in this circuit is much as Judge Haines says it ought to be: there must be extrinsic evidence of fraudulent intent, though precisely what might constitute such evidence is not clear.[27]

■ This court is, frankly, as troubled as is Judge Haines by the inherent unpredictability of the rule that has developed under section 727(a)(2). How, after all, is a lawyer to advise a client with regard to what will count as innocent intent versus fraudulent intent in this context? Yet, so long as the rule in this circuit is that the outcome is determined on whether a fraudulent intent is or is not present, the court is constrained to sift the evidence for such intent or the lack thereof. Once again, Judge Haines' decision in *Crater* is helpful. Because intending to exploit one's entitlement to exemptions is not, of itself, evidence of the sort of fraudulent intent proscribed by section 727(a)(2), the fact that the Lees structured the sale of the Braun Road property in such a way as to channel the proceeds into enhancing the equity in their Gillespie

---

**26.** For good reason, too. Such a reading of section 727(a)(2) would conflict with section 522(b), which permits a debtor to claim as exempt, property that is exempt under applicable state or federal law *as of the commencement of the case. See* 11 U.S.C. § 522(b). If Congress intended section 727(a)(2) to have the meaning suggested by Judge Barksdale, then one would have expected Congress to set the debtor's eligible exemptions at those to which he or she was entitled *as of one year before the bankruptcy case.* That would make the two sections harmonious using Judge Barksdale's reading. But that is not what section 522(b) in fact provides.

**27.** Judge Jones, writing for the court, added a reference to pigs and hogs, a nod to decisions such as *Norwest Bank Nebraska, N.A. v. Tvet-*

en, 848 F.2d 871, 879 (8th Cir.1988), *In re Zouhar*, 10 B.R. 154, 157 (Bankr.D.N.M. 1981), and *In re Bowyer*, 932 F.2d 1100 (5th Cir.1991) (affirming the bankruptcy court's finding of intent to hinder, delay or defraud creditors on facts before it). She stops short, however, of holding that a "hog" finding would equal competent evidence of fraudulent intent. One of the problems with the pigs/hogs analogy is that it is as inherently sensitive to peculiar sensitivities of trial judges as is the now vilified notion of substantive due process so dismissively derided by Justice Oliver Wendell Holmes in *Lochner v. New York. See* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (Holmes, J., dissenting) ("the 14th Amendment does not enact Mr. Herbert Spencer's Social Statics").

County homestead is not, by itself, sufficient to establish the requisite fraudulent intent for section 727(a)(2) purposes. We must look for "something more." *See In re Crater*, 286 B.R. 756, 772 (Bankr.D.Ariz. 2002).[28]

The Fifth Circuit cases that have described facts that qualify as that "something more," or, in Judge Haines' words, as extrinsic evidence of fraudulent intent, do not furnish the court with clear direction. Again, each of these cases is limited by the role the circuit court plays in the process—that of determining whether the lower court's findings were clearly erroneous. Both *Reed* and *Bowyer* affirmed the lower court's findings, one granting the debtor a discharge and one denying the discharge, even though the underlying facts were similar. In both cases, the debtor converted nonexempt property into exempt property, in a time period relatively close to the bankruptcy filing. Because, in both cases, the circuit court was constrained to accept the lower court's credibility determinations, and could reverse only if the reviewing court, after evaluating the evidence, is left with the definite and firm conviction that a mistake has been committed.[29] A given fact pattern, then, does not by itself demonstrate fraudulent intent. All of the nuances of the evidence in a given case can dramatically affect the ultimate finding.

Though fact patterns are not decisive, they may be indicative.[30] Some kinds of facts seem to come up with greater frequency in those cases in which discharge is ultimately denied under section 727(a)(2). For example, in *Reed* and *Swift*, the debt-

---

**28.** Says Judge Haines:

> Congress did not invite bankruptcy judges to grant or deny the discharge based on an amorphous, individualistic finding, such as "reasonable" or "good faith." Instead, it made the requisite determination hinge on intent, something that common law precedent has successfully refined over the centuries, particularly in tort law and in criminal law. Consequently, here it is appropriate for courts to seek to refine and define the requisite intent, so that the evolution of precedent may in the long run yield predictable, practical rules.
> . . .
> Both the second and third categories of the badges of fraud [described earlier in the opinion] merely underscore that the debtor intended to take advantage of available exemptions. The timing factors make that more evident than if the exempt property were purchased before bankruptcy was imminent, and engaging in an otherwise uneconomical transaction eliminates another possible motive, but neither of these makes the intent any more than an intent to utilize available exemptions.

*In re Crater*, 286 B.R., at 772.

**29.** *See In re Evert*, 342 F.3d 358, (5th Cir. 2003) (stating that a bankruptcy court's findings of fact are reviewed under the "clearly erroneous" standard while conclusions of law are reviewed *de novo*); *see also Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1308 n. 5 (5th Cir.1985) (stating that "[A] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.") (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)).

**30.** Judge Haines, in *Crater*, breaks down the traditional badges of fraud into three categories, only the first of which is directly indicative of deception or fraudulent intent. *Crater*, 286 B.R., at 764. In that first category are the following badges (drawn from the Uniform Fraudulent Transfer Act): (1) debtor retains possession or control of the property transferred after the transfer; (2) the transfer was concealed; (3) the debtor absconded; (4) the debtor removed or concealed assets. None of these badges apply to the facts here. The Braun Road property was controlled by Lee Elms through St. Andrews after the transfer; the transfer was recorded in the deed records; Mr. Lee didn't go anywhere; Mr. Lee didn't remove or conceal any assets.

or was found not to have been candid with the trustee, the creditors and the court in the bankruptcy case itself, trying, for example, to hide transfers. In *Bowyer*, by contrast, the debtor was candid in his schedules as well as at the first meeting of creditors. Also, in *Reed*, the debtor apparently tried to disguise his conduct pre-bankruptcy so that creditors would not be able to see what he was doing. Again, in *Bowyer*, the debtor simply took money out of a nonexempt bank account, and used it to make repairs to his exempt homestead, without artifice, and apparently not in contemplation of the later bankruptcy filing.

■ In this case, the Lees commenced liquidating nonexempt investment funds, and began paying down their mortgage on the Gillespie County homestead in late 2001 and early 2002. The paydowns were direct and undisguised. Mr. Lee also asked his lawyer, Lee Elms, to look into getting the Braun Road property sold, with a view to raising money to pay off the mortgage on his Gillespie County homestead. This was in January 2002. Elms structured the family partnership/St. Andrews Enterprises transactions, no doubt aware of the pending litigation and concerned that he maximize protecting his client's homestead interests (and achieve his intentions). The deeds reflecting these transfers were duly recorded in the deed records. At the same time as these events were taking place, two things were going on in the Lees' lives. One was their involvement in the Atofina and Martin Marietta lawsuits. The other was the apparent collapse of Champion Asphalt, the obligor on the $1.5 million note that represented the Lees' primary source of continuing income for the future (other than their Social Security).[31] Their motivations during this period of time in their lives was thus, at best, mixed.

The court cannot say on these facts that the debtor's activities were intentionally aimed at hindering, delaying and defrauding Atofina and Martin Marietta. There is just as much credible evidence that the debtors were worried about assuring that they would not end up destitute, without even a homestead. Granted, the home that they had purchased for themselves was not cheap—but it was purchased at a time when they well believed they could afford it. It was not illegitimate for them to try to hang on to that one investment that both assured them a place to live as they grow old, and a source of money in the event of an emergency in the future. The eventual sale of the property took place shortly after the judgments were obtained, but that seems to have been serendipitous. The purchaser (Stoerbeck) bought at arms' length, and paid a fair price for the property. The timing of the application of the proceeds, therefore, had less to do with the judgments and more to do with when a purchaser was found. The debtors filed their chapter 7 case a little over a month after this transaction was closed and the proceeds applied to satisfy the mortgage on the Gillespie County property, it is true, but the filing appears to have been triggered not by plan but by the commencement of postjudgment collection action on the part of Atofina and Martin Marietta. That sort of activity is what often triggers a bankruptcy filing. The bankruptcy schedules were candid in showing the existence of the family partnership, and the statement of affairs disclosed the entire Braun Road transaction, as well as the ultimate payoff of the mortgage on their Gillespie County homestead.

---

**31.** Between them, the Lees receive approximately $2,400 a month. Their mortgage payment on the Gillespie County property was approximately $4,000. They also reported ordinary living expenses in excess of $3,200 a month.

They were also candid about the entire arrangement at the first meeting of creditors.

There is little doubt that Mr. Lee had considerable distaste for paying the guaranty obligations to Atofina and Martin Marietta. For so long as he had run his business, he had always remained current with his trade creditors, including Martin Marietta (or its predecessor). The liability that formed the basis for these lawsuits was generated by the self-same entity that had defaulted on its obligation to Lee. Bad enough that he had lost the benefit of selling his business, jeopardizing his retirement. Now, the Lees were also facing the distasteful prospect of having to pay for someone else's business ineptness, out of their own, now finite, assets. Was their activity aimed at defrauding a coming bankruptcy estate? On these facts (and based upon the court's evaluation of the credibility of the testimony of both Mr. Lee and Mr. Elms), the answer is no. Was this activity even aimed at trying to defraud Atofina and Martin Marietta? Again, in the court's view, the answer is no. The aim was to preserve, from their finite assets, their homestead so that they could live in it during their retirement. Both Mr. and Mrs. Lee are too old to start over. Their only regular income today comes from Social Security. The goal of their prebankruptcy activity was to salvage for themselves what little was left from their abortive effort to sell their business (an effort that was supposed to afford them a comfortable income for their retirement). As of trial, their homestead and their Social Security income is all they have.

Had they not taken protective action, Atofina and Martin Marietta, both of whom happily extended credit to Champion Asphalt without regard to that company's financial wherewithal, would levy on the assets of the Lees, who had nothing to do either with these creditors' extending credit, or with Champion Asphalt's failing to pay them. Not only would the Braun Road property have been sold to satisfy these claims, but also the debtors' other investments would, in all likelihood, have been garnished, leaving the debtors with no income to be able to pay off the mortgage on the Gillespie County property. A foreclosure in the not-too-distant future would have been likely, leaving the Lees with little or nothing to live on beyond Social Security, and no homestead. Does it demonstrate fraudulent intent that the Lees took action to avoid this ugly scenario? The court thinks not.

The court finds, accordingly, that the creditors have failed to sustain their burden of proving by extrinsic evidence fraudulent intent on the part of the Lees. Absent such a finding, the objecting parties cannot sustain their objection to discharge based on section 727(a)(2).

### Conclusion

For the reasons stated, the court concludes that the objecting parties have not sustained their burden to prove grounds for denial of the debtors' discharge under sections 727(a)(2), (3), (4), (5), and (7).[32] A form of judgment consistent with this decision will be entered in each of the adversary proceedings.

---

**32.** The objection under subsection (a)(7) required, as a prerequisite, a finding of grounds for discharge on one of the other named sections. As none was established, there is no basis for denial of discharge under subsection (7) either.