# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
October 8, 2025

Lyle W. Cayce
Clerk

No. 24-10439

In the Matter of Darren Scott Matloff

*Debtor*,

Triumphant Gold Limited,

*Appellant*,

*versus*

Darren Scott Matloff,

*Appellee*.

———————————————————————

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:22-CV-274

———————————————————————

Before Graves, Engelhardt, and Oldham, *Circuit Judges*.

Per Curiam:[*]

　　After Debtor-Appellee Darren Scott Matloff filed a voluntary petition for Chapter 7 bankruptcy relief, Appellant Triumphant Gold Limited ("TGL"), a creditor, filed this adversary proceeding. Opposing Matloff's

———————————

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

entitlement to discharge, TGL invoked certain provisions of sections 727 and 523 of the United States Bankruptcy Code, which govern "discharge" and "exceptions to discharge," respectively. Concluding that TGL had failed to satisfy its burden of proving that Matloff's debt to it should be declared nondischargeable under § 523, or that Matloff should be denied a discharge under § 727, the bankruptcy court denied and dismissed TGL's claims. The district court affirmed and this appeal followed. On the instant record, we are unable to render a final assessment of one part of TGL's claim regarding 11 U.S.C. § 523(a)(6). Otherwise, we ascertain no reversible error in the bankruptcy court's disposition. Accordingly, we AFFIRM IN PART and VACATE and REMAND IN PART.

I.

In 2008, Matloff formed Rooftop Group USA, Inc. ("Rooftop Group USA" or "Rooftop USA") in California. Matloff was the sole shareholder and chief executive officer ("CEO") of Rooftop USA, and the CEO of Asian Express Holdings, LTD ("Asian Express"), a Hong Kong company. Under Matloff's direction, Rooftop USA and Asian Express collaborated in the manufacture and distribution of leisure-use remote-controlled flying drones and helicopters under the "Propel" brand. ROA.21332:14–21; ROA.21267.

Asian Express was responsible for product manufacture, contracting directly with Chinese suppliers and manufacturers for the parts necessary to assemble the Propel-branded products. Overseas customers and U.S.-based customers with the capacity to take delivery directly from the manufacturer (in China) could place orders with Asian Express. ROA.21332–33. Otherwise, U.S.-based customers seeking delivery from a U.S.-based distributor would contract with Rooftop USA, which would place product orders with Asian Express. ROA.21870. Rooftop USA would then remit funds to Asian

No. 24-10439

Express to cover the costs and expenses incurred in fulfilling Rooftop USA's purchase orders.

As part of a broader plan to restructure the business (to take advantage of perceived tax attributes and attract equity investment), a global corporate "Rooftop Enterprises" structure was established in late 2014 and early 2015. Rooftop Group International Pte. Ltd. (hereinafter referred to as "Rooftop Singapore" or "Rooftop") was formed as the new parent company of a series of subsidiary companies that were created to segment anticipated growth of business activity in North America, Europe, and Asia. ROA.22223; ROA.18308, 15603. One of the newly-formed subsidiaries was Rooftop Group Services (US), Inc. ("Rooftop Services"). ROA. 29; ROA.18307.

Through a series of agreements executed as of January 1, 2015, the historical business and assets of Rooftop USA were conveyed to Rooftop Singapore and Rooftop Services. Relationships between certain Rooftop Entities also were memorialized in a pair of agency agreements (the "Agency Agreements"). In the first Agency Agreement, Rooftop Singapore engaged Asian Express to act as its agent in carrying out the manufacturing, distribution, and sales business that had comprised Asian Express's historical Propel-related business. ROA.13277. Asian Express remained responsible for engaging third-party manufacturers in China. ROA.31; ROA.7550. In the second Agency Agreement, Rooftop Services engaged Rooftop USA to act as its agent for the sales representative activities in North America that had comprised Rooftop USA's historical business. ROA.13293. Asian Express and Rooftop USA, as agents, were required to remit customer payments to Rooftop Singapore and Rooftop Services, respectively.

No. 24-10439

In early 2016, The Walt Disney Company Limited licensed Asian Express to manufacture a new line of Star Wars themed drones for distribution in the 2016 holiday season (the "Disney License"). ROA.13816. Anticipating an increase in costs associated with manufacturing the new product line, Rooftop Singapore sought additional liquidity through external financing sources. ROA.21355:25–21356:15.

TGL provided financing pursuant to two secured loan agreements with Rooftop Singapore—one executed in 2016 and one in 2017. *See* ROA.21734:8–14; ROA.7429–56 (secured credit facility loan agreement dated as of July 25, 2016 (the "2016 Loan Agreement"); ROA.7708–14 (secured credit facility loan agreement dated as of July 5, 2017 (the "2017 Loan Agreement")). Matloff personally guaranteed Rooftop Singapore's obligations under the 2016 and 2017 Loan Agreements by means of a Personal Guaranty dated July 25, 2016, and a Deed of Guaranty dated October 30, 2016 (together, the "Personal Guaranty"). ROA.13331, 13335.

Beginning with the 2016 Loan Agreement, Rooftop Singapore pledged, as security for the loans, (a) purchase-order proceeds and accounts receivable (ROA.7438); (b) cash deposited in Asian Express bank accounts that were subject to a "charge" in favor of TGL ("Charged Accounts") (ROA.7436; ROA.21732:7–15); and (c) stock (ROA.7470–7511). [1] As part of

_____

[1] Regarding the "Charged Accounts," TGL's brief explains: "Similar to an account control agreement, TGL could monitor the account and execute its charge/sweep funds on default, subject to terms." *See* Appellant's Brief, ECF 23, p. 18 n.3; ROA.10746–67. At trial, TGL's representative, Danny Yee ("Yee") was asked: "What does it mean to charge a bank account"? He responded: "It places a lien—on the bank account." ROA.21732. *See also* June 26, 2016 "Accounts Charge" agreement between Asian Express and TGL, ROA.10747–67; ROA.10750, ¶¶ 3.1–3.3 (Establishing a "first fixed charge" in favor of Lender on Chargor's right, title, interest in Deposits as security for payment and discharge of secured obligation; assignment in favor of Lender; release of security); ¶6.2 (Establishing restrictions regarding receipt, withdrawal, and transfer of any Deposit); ¶6.3 (Establishing Lender rights in the event of an uncured Event of Default, including demand

the arrangement, Rooftop USA collected cash proceeds of purchase orders or accounts receivable in its U.S.-based Chase bank account and then transferred those funds to Asian Express (in Asia) for deposit in the Charged Accounts.    ROA.7718    (¶7(a)(iv));    ROA.8052;    ROA.21285:13-21; ROA.21779. These security-related measures were continued and enhanced in the 2017 agreements.

Because TGL thought the original Agency Agreements "weren't strong enough," the agreements were amended on October 31, 2016. As set forth in the bankruptcy court's opinion:

> The amendments required by TGL were intended, in part, to (i) more clearly state that the activities of the agents were for the benefit of the Rooftop entities; (ii) perfect TGL's claim over the underlying collateral of the credit facility, namely, the sale proceeds of the Propel-branded drones; and (iii) require that the agents who collected proceeds of accounts receivable pay the proceeds into specific bank accounts over which TGL would have control and were charged to TGL (the "Charged Accounts"). The Amended Agency Agreements also inserted, among others, the following two provisions:
>
> - [A]ll customer payments received by the Agent . . . will be paid over to the Company . . . as soon as reasonably practicable, provided that the Agent may . . . retain from the customer payments such amount of cash in order for the Agent to pay for operating

---

and receipt of monies due under or arising out of each Deposit and the right to "apply, set-off or transfer any or all of the Deposit in or towards the payment or other satisfaction of the Secured Obligations or any part of them"); ¶9 (Security Enforcement).

TGL did not have a "charge" on Rooftop USA's Chase bank account. However, until cancelled at Matloff's direction, TGL did have "read-only access" for the "non-charged" Chase bank account. *See, e.g.,* ROA.21779. ROA.21792.

No. 24-10439

expenses in connection with the Agent's performance of its duties hereunder[.]

- [A]ll debts, liabilities, claims and obligations . . . of the Agent shall not be borne by the Company or any other Rooftop Group member.

*See Triumphant Gold, Ltd. v. Matloff (In re Matloff)*, No. 19-44253-MXM-7, 2022 WL 879255, at *7–8 (Bankr. N.D. Tex. Mar. 24, 2022); ROA. 34–35.

The 2017 Loan Agreement was revised and extended by a series of five "side letter agreements." *See* ROA.40–44; ROA.7715–52; ROA.7764–77; ROA.7793–807; ROA.7839–70; ROA.8046–295 (collectively, the "Side Letters"). With each Side Letter, Rooftop Singapore and Matloff accepted more onerous terms in exchange for financing from TGL. ROA.22301:6–13.[2] TGL ultimately funded $11.75 million to Rooftop Singapore—$11.25 million in July and August 2017, and an emergency loan of $500,000 in January 2018. ROA.18144–45; ROA.8050; ROA.21788:14–25.

In October 2017, TGL agreed to Rooftop Singapore's entering into a "factoring" agreement with Star Funding in order to achieve faster cashflow.[3] ROA.22270:20–23. Pursuant to this agreement, Rooftop Singapore received credit upon assigning certain purchase orders to Star Funding.[4] To facilitate the arrangement, TGL subordinated its liens such

---

[2] Three Side Letters were executed contemporaneously with the three advances made under the 2017 Loan Agreement. ROA.13361, 13399, 13413. The final two were executed on September 22, 2017, and January 16, 2018. ROA.13428; ROA.13460.

[3] The October 2017 agreement between Rooftop Singapore and Star Funding was memorialized in a Supply Agreement and accompanying Factoring Agreement. ROA.13710 *et seq.*; ROA.13727 *et seq.*; ROA.21403:16–24.

[4] For those orders, Star Funding would pay suppliers directly, take ownership of inventory, and collect the proceeds upon fulfillment. ROA.13710 *et seq.*; ROA.13727 *et seq.* After deducting costs and commissions, Star Funding remitted the balance to Rooftop USA to pay other operating expenses. *Id.*

that Star Funding held a first-lien position on factored purchase orders. On purchase orders that were not factored, however, TGL's lien position was unchanged. ROA.7875; ROA.22034:25–22035:12.

On the (extended) maturity date of the 2017 Loan Agreement—December 28, 2017—a Rooftop Singapore executive informed TGL, via email: "Rooftop [Singapore] will not be paying interest and remaining principal today." ROA.8044; ROA.21783–84. Although Rooftop Singapore did make another payment to TGL, on January 3, 2018, an unpaid principal balance of $3,903,895.65 remained.

On January 16, 2018, TGL, in the final Side Letter, agreed to forebear from immediately declaring a default, to further extend maturity, and to provide the $500,000 emergency loan. ROA.21786:18-21788:25; ROA.22270:12-19; ROA.8050. In exchange, Rooftop Singapore agreed, among other things, to pledge as collateral all then-existing and future purchase orders and receivables to TGL and reaffirmed that the proceeds would be deposited in the Charged Accounts. ROA.8053–54 (¶9A.(a)); ROA.21789–90; ROA.8052–53 (¶7(a)(iv)); ROA.21773–74. TGL and Rooftop Singapore also scheduled a meeting to be held on February 12, 2018, the further-extended maturity date, to discuss the status of the 2017 Loan Agreement.  But Rooftop Singapore again failed to pay the outstanding balance (of approximately $3.9 million) and, at the February 12th meeting, Matloff was given a notice of default letter that was to take effect on February 15, 2018. As promised, TGL's counsel sent a formal notice of default to Rooftop Singapore on that date. ROA.8318.

No. 24-10439

Thereafter, on March 1, 2018, Matloff transferred $846,919.82 from the Charged Accounts (in Asia) to Rooftop USA's bank account (in the United States).  On the day of the electronic transfers, Matloff informed TGL's principals via email:[5]

> Dear all, as promised the wire transfers to both Polar and TGL/Aktis have gone out and Phoebe will be sending notification of such. My original plan was to pay all the emergency bills that were already discussed directly from the same accounts last night[,] alongside the payments to Aktis/Polar, but unfortunately, Phoebe was not able to get the detailed instructions for these payments. Realizing that the funds would not go out at the same time[,] I made the decision to move the emergency funds back to our [U.S.] account where the bills will be paid today from America. Anita will forward the receipts of all bills paid for your records and of course you have visuals as well.
>
> The reasoning underpinning my last minute decision to transfer the funds back to the US to pay the bills has to do with the realistic threat that Aktis/Polar is actively accelerating on the company and therefore I must take seriously the threat to freeze our accounts in Asia. I must ensure that the emergency bills get paid first and foremost as our ability to continue operating is absolutely necessary if we are to meet our fiduciary obligations to all of our creditors.
>
> I hope we can work as [a] team to move forward amicably and resolve our problems.[6]

_____

[5] Although the email reflects a date of February 28, 2018, and a 6:12 p.m. transmittal time, the parties reference this transfer as having occurred on March 1, 2018.

[6] ROA.8321; ROA.21791–92. According to the bankruptcy court, "TGL is a special purpose vehicle used by Atkis Capital for finance situations, such as TGL's financing of Rooftop Singapore."  ROA.33.

No. 24-10439

At trial, Matloff testified regarding the transfer:

> I felt I had no choice but to breach my agreement. I transferred the money back to the U.S. account to protect it, because I was afraid they would somehow freeze the accounts in Asia.[7]

On March 1, 2018, at 11:10 p.m., Yee sent an email to Matloff and other Rooftop personnel stating, among other things:

> We note that you have instructed your treasury people to release funds to both Polar/TGL as part of effort to reestablish some good faith and credibility with some pay down. We have reviewed online bank records and note your usage. Let me point out that there is no agreement in place on the use of the proceeds on the charged account other than what has been written in our agreement. We do not have an agreement to split use cash in the charged account 50/50 as implied in you[r] note below. We take issue with the clear breach of our agreement in two material respects. The first being the condition precedent for our necessary prior consent and the second being that use of the proceeds to pay third parties reducing our security interest.
>
> * * *
>
> In closing, there are some serious matters to be addressed and failure to immediately respond will result in TGL to move forward with exercising it[s] rights to protect and recover monies owed to us.[8]

---

[7] ROA.21425:15–18; ROA.8889.

[8] ROA.8337.

No. 24-10439

Then, on March 6, 2018, at 7:59 p.m., Yee sent an email to Matloff and Rooftop Singapore's General Counsel stating, among other things:

> Sirs,
>
> As per our agreement, we have been monitoring the charged bank account which is part of our security against our loan.
>
> We note that the company continues to breach our agreement by using the funds without our consent and concurrently reducing our value of our security. This is despite our lawyers having previously written to you reminding you of the company's obligations to us as a secured creditor. We are putting you on notice that this use of the funds in breach of our agreement should immediately cease and desist.
>
> I remind you of certain fiduciary responsibilities which both of you personally have as Directors of the company. We reserve our rights to take all steps necessary to protect our security.[9]

After Rooftop Singapore defaulted on the TGL loans, in February 2018, Rooftop USA ceased remitting collected proceeds to the Charged Accounts in Asia. Instead, Rooftop USA maintained the funds in its non-charged Chase bank account in the United States. From there, the funds were disbursed, as directed by Matloff, in payment of Rooftop Singapore's various operating costs and other expenses. ROA.49–50; ROA.8334; ROA.21274; ROA.21283–88.

Matloff attempted to find new financing (to repay TGL's outstanding loan balance and cover Rooftop Singapore's operating expenses), but his

_____

[9] ROA.8334; ROA.19044–46; ROA. 21792–96.

efforts were unsuccessful.[10] As a result, because Rooftop Singapore and Asian Express lacked sufficient funding to provide timely payment, the Chinese suppliers and manufacturers immediately stopped shipping goods. According to Matloff, "at that point, it was game over." Rooftop Singapore was at substantial risk of failing to deliver the Propel-brand drone products to its customers in time for their annual retail purchasing cycle and, if that occurred, Rooftop Singapore would lose its customers and "lose complete credibility" in the retail marketplace.

In mid-February 2019, because Rooftop Singapore still lacked adequate funding and the ability to timely deliver Propel-brand drone products ordered by its retail customers, Matloff (and, in turn, Rooftop Singapore) entered into a *Trademark License Agreement* and a side letter dated February 24, 2019 (together, the "Amax License") with Amax Industrial Group China Co., Ltd., a Hong Kong company ("Amax"). According to the bankruptcy court, Matloff testified credibly that the business purpose of granting the license to Amax was to (i) "keep the brand alive and to get someone to negotiate with those [Chinese] factories," (ii) "preserve the Propel brand for the—for the benefit of all parties involved," and (iii) "not stop the shipments, to keep the shipments going." ROA. 5; ROA.21288–93. Under the Amax License, Amax was required, in part, to:

- Pay Rooftop Singapore a 3.5% royalty.
- Hire Rooftop Singapore's core China employees [who] were critical to maintaining the [China-based] manufacturing and production of the Propel-brand products.

---

[10] *See, e.g.*, ROA.8335–50 (February and March 2018 email correspondence between Matloff and Yee referencing Rooftop efforts to secure additional financing that would, *inter alia*, enable Rooftop Singapore to pay its debt to TGL).

- Manufacture the goods using only Propel approved "core suppliers."

- Pay an additional 5% over cost to the core suppliers until the[] outstanding debts owed by Rooftop Singapore/Asian Express ha[d] been paid.[11]

On April 30, 2019, Rooftop Singapore filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. And, on August 25, 2019, both Rooftop Group USA and Rooftop Services filed for bankruptcy relief under Chapter 7. The three bankruptcy cases were jointly administered and, ultimately, a joint plan of reorganization and liquidation was confirmed. ROA.53.

In the interim, TGL and Matloff had commenced litigation and then arbitration in Singapore regarding the defaulted 2017 Loan Agreement. Specifically, on April 27, 2018, TGL sued Matloff—based on his guaranty of Rooftop Singapore's obligations under the 2017 Loan Agreement—in the High Court of the Republic of Singapore. In December 2018, a judgment was rendered against Matloff for $4,427,209.82 (USD) plus interest, and $27,000 (SGD) in costs. ROA.8409.

On June 19, 2019, Matloff filed a voluntary petition for bankruptcy relief under Chapter 7. Then, on July 1, 2019, Matloff and Amax entered into a Consultancy Agreement, pursuant to which Matloff was required to perform the same services for Amax that he was performing for Rooftop Singapore and its subsidiaries. ROA.52–53.

---

[11] ROA.52.

II.

On December 6, 2019, TGL filed an adversary complaint in Matloff's Chapter 7 bankruptcy proceeding, contending that Matloff's debt is not dischargeable, and invoking certain provisions of Sections 523 and 727 of the United States Bankruptcy Code, which govern "exceptions to discharge" and "discharge," respectively. *See* 11 U.S.C. §§ 523, 727. Ultimately, trial was held, and the bankruptcy court, in a 139-page decision, denied all of TGL's claims of non-dischargeability. *See Triumphant Gold, Ltd. v. Matloff (In re Matloff)*, No. 19-44253-MXM-7, 2022 WL 87925, at *64.

TGL appealed to the district court, certifying four questions for review. *See Triumphant Gold, Ltd. v. Matloff (In re Matloff)*, No. 4:22-CV-0274-P, 2023 WL 3763861, at *2 (N.D. Tex. June 1, 2023). The district court affirmed in a short opinion, and TGL appealed to this court. Concluding the district court had applied the wrong standard of review, the panel vacated that decision and remanded. *Triumphant Gold, Ltd. v. Matloff (In re Matloff)*, 2024 WL 1193562, at *2 (5th Cir. Mar. 20, 2024). On remand, the district court again affirmed. *Triumphant Gold, Ltd. v. Matloff (In re Matloff)*, No. 4:22-CV-0274-P, 2024 WL 2034210, at *2 (N.D. Tex. Apr. 11, 2024). TGL timely appealed to our court for the second time.

III.

When reviewing the decision of a district court acting as an appellate court, we "apply[] the same standard of review to the bankruptcy court's conclusions of law and findings of fact that the district court applied." *In re JFK Cap. Holdings, L.L.C.*, 880 F.3d 747, 751 (5th Cir. 2018) (quoting *Barron & Newburger, P.C. v. Tex. Skyline, Ltd. (In re Woerner)*, 783 F.3d 266, 270 (5th Cir. 2015) (en banc)). Accordingly, questions of fact are reviewed for clear error and conclusions of law are reviewed *de novo*. *Countrywide Home Loans, Inc. v. Cowin (In re Cowin)*, 864 F.3d 344, 349 (5th Cir. 2017). Mixed questions of law and fact also are reviewed *de novo*. *Id.*

No. 24-10439

IV.

"The bankruptcy statutes have a two-fold purpose—first, to secure the equitable distribution of the bankrupt's estate among his creditors, and second, to relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes." *Pavy v. Chastant* (*In re Chastant*), 873 F.2d 89, 90 (5th Cir. 1989) (quoting *In re Devers*, 759 F.2d 751, 754–55 (9th Cir. 1985) (citations and quotations omitted)). A discharge granted under § 727(a) of Title 11 of the United States Code "discharges the debtor from all debts that arose before the date of the order for relief under this chapter" *unless* one of several specified exceptions is met. *See* 11 U.S.C. § 727 (b); § 727(a) ("The court shall grant the debtor a discharge, unless . . . ."); *see also, e.g., Cadle Co. v. Duncan* (*In re Duncan*), 562 F.3d 688, 695 (5th Cir. 2009) ("The bankruptcy code requires discharge of the debtor unless a statutory exception applies."); *Robertson v. Dennis* (*In re Dennis*), 330 F.3d 696, 701 (5th Cir. 2003). The application of four statutory exceptions to discharge are at issue here—two are found in § 727(a) and two are in § 523(a).

If a § 727(a) discharge exception applies, *none* of the bankrupt debtor's debts are discharged. *See Thibodeaux v. Olivier* (*In re Olivier*), 819 F.2d 550, 552 (5th Cir. 1987) (citing *First Tex. Sav. Ass'n v. Reed (In re Reed)*, 700 F.2d 986 (5th Cir. 1983)) ("A bankrupt's violation of the provisions of 11 U.S.C. § 727 entirely bars discharge[.]"). In contrast, § 523(a)'s discharge exceptions have only selective application, i.e., only particular, specified debts are excepted from the discharge of debt that the debtor otherwise is granted. *In re Olivier*, 819 F.2d at 552 ("11 U.S.C. § 523 . . . allows discharge but bars the discharge of particular debts."); *Moreno v. Ashworth* (*In re Moreno*), 892 F.2d 417, 420–21 (5th Cir. 1990) (affirming judgment insofar as it declared certain debts non-dischargeable under § 523(a)(4) but reversing to the extent the debtor was denied discharge under § 727(a)(2)(A)); *Leyva v. Braziel (In re*

*Braziel)*, 653 B.R. 537, 546 (Bankr. N.D. Tex. 2023) ("Whether a particular debt is dischargeable—as opposed to a discharge of all debts—is governed by § 523 of the Bankruptcy Code.").

A. <u>11 U.S.C. § 727(a)(2)(A) & (a)(7)</u>

Section 727(a)(7) precludes a grant of discharge if, within one year before, or during, the debtor's bankruptcy case, one of the objectionable acts described in § 727(a)(2)–(6) was committed by an individual debtor in connection with another bankruptcy case involving a "corporation of which the debtor is a director, officer, or person in control[.]" *See* 11 U.S.C. § 727(a)(7); 11 U.S.C. § 101(31)(A)(iv) (defining "insider" if the debtor is an individual).[12] Section 727(a)(2)(A) is one of the provisions on which TGL relies to describe the relevant debtor conduct. It precludes discharge if "the debtor, *with intent to hinder, delay, or defraud a creditor* . . . has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed . . . property of the debtor, within one year before the date of the filing of the petition." *See* 11 U.S.C. § 727(a)(2)(A) (emphasis added).

TGL presents three challenges to the bankruptcy court's unfavorable assessment of its § 727(a)(2)(A) non-dischargeability claim. First, TGL argues the court applied the wrong legal standard when it required proof of "actual intent to defraud." Second, TGL argues the court erred in concluding that Matloff, the individual debtor, did not have the requisite intent.

---

[12] *See* 11 U.S.C. § 727(a)(7) ("[T]he debtor has committed any act specified in paragraph (2), (3), (4), (5), or (6) of this subsection, on or within one year before the date of the filing of the petition, or during the case, in connection with another case, under this title or under the Bankruptcy Act, concerning an insider[.]" *See also* § 86:17. Insider Cases (Code § 727(a)(7)), 3 Norton Bankr. L. & Prac. 3d § 86:17.

No. 24-10439

Lastly, TGL argues the court erroneously required it to show that it was injured by the challenged transfers.

1. Applicable Legal Standard

Contending Matloff admitted to having caused Rooftop USA to transfer property "with the intent to hinder or delay a creditor," TGL argues the bankruptcy court erred in its analysis of § 727(a)(2)(A)'s intent element insofar that it required TGL to establish that Matloff had acted with "actual intent to defraud creditors." Specifically, TGL contends that "intent to hinder, delay or defraud" is "stated in the disjunctive, which signifies that an intent to hinder *or* to delay *or* to defraud is sufficient." (Emphasis added.) *See* Appellant's Br., ECF 23, pp. 37–43. It argues that "evidence of a debtor's intent to hinder or delay creditors" is sufficient; "[e]vidence of actual intent to defraud is not required." *Id.* at 38.

In response, Matloff maintains that TGL presents its "disjunctive" argument regarding § 727(a)(2)(A)'s intent element for the first time on appeal to this court. Emphasizing that the argument was not made to the bankruptcy court—before, during, or after trial—or designated as an error of law on appeal to the district court,[13] Matloff contends that TGL failed to preserve the issue for appeal and is precluded from raising it now.

---

[13] In its post-trial briefing, TGL repeatedly argued that Matloff had transferred property "in order to hinder, delay, *and* defraud TGL." ROA.20035; ROA.20094. (Emphasis added.) And, on appeal to the district court, TGL asserted: "The Bankruptcy Court *correctly* recognized a discharge may be denied if 'the debtor, with intent to hinder, delay, or defraud a creditor . . . has transferred . . . property of the debtor, within one year before the date of the filing of the petition.' '[E]vidence of actual intent to defraud creditors is required[.]'" ROA.22398 (emphasis added; internal citations omitted). And, in its district-court reply, TGL utilized the same fraud analysis employed by the bankruptcy court, arguing only the same clear-error objections found in its initial appellate briefing. ROA.22764.

No. 24-10439

We agree. Arguments and issues not first raised in the trial court generally are forfeited on appeal. *See, e.g., Harris v. FedEx Corp. Servs., Inc.*, 92 F.4th 286, 296 (5th Cir.), *cert. denied*, 145 S. Ct. 168 (2024); *Rollins v. Home Depot USA, Inc.*, 8 F.4th 393, 397–98 (5th Cir. 2021). Although exceptions exist for jurisdictional issues and questions of law that, if not addressed, would result in a miscarriage of justice, neither exception applies here. [14]

---

[14] While not deciding the merits of this issue, we note that most of our § 727(a)(2)(A) cases consider whether the evidence submitted supports a finding of "actual intent to defraud." *See, e.g., In re Reed*, 700 F.2d at 991; *In re Dennis*, 330 F.3d at 701–03; *Swift v. Bank of San Antonio (In re Swift)*, 3 F.3d 929, 931 (5th Cir. 1993); *In re Chastant*, 873 F.2d at 90–91; *In re Moreno*, 892 F.2d at 420–21; *but see NCNB Tex. Nat'l Bank v. Bowyer (In re Bowyer)*, 916 F.2d 1056, 1060 (5th Cir. 1990) ("Bowyer's actions . . . are extrinsic evidence of an intent to hinder and delay a creditor, even though he may not have had an intent to defraud them."), *rev'd on reh'g*, 932 F.2d 1100, 1102–03 (5th Cir. 1991) (reasoning that the factfinder found no fraudulent intent and that "factual findings of the district court fully support its legal conclusion that [use of non-exempt savings] was legitimate pre-bankruptcy planning [transaction] . . . that cannot support a finding of intent to delay or hinder creditors"); *id.* at 1103 (Barksdale, J., dissenting) ("As held in our previous opinion, the error arose out of focusing on intent to defraud, and failing to address separately intent to hinder or intent to delay. By granting rehearing and affirming the judgment of the district court, the majority . . . continues this error."); *see also Martin Marietta Materials Sw., Inc., et. al. v. Robert Lee (In re Lee)*, 309 B.R. 468, 483 (Bankr. W.D. Tex. 2004) (characterizing *In re Bowyer*'s ruling, on rehearing, as having "rejected the notion that the word 'defraud' in the phrase 'hinder, delay, or defraud' be read separately" and concluding that "mere actions to hinder or delay, absent showing of an intent to defraud as well, is insufficient to make the showing under section 727(a)(2)(A)").

TGL cites our decision in *Wiggains v. Reed (In re Wiggains)*, 848 F.3d 655, 661 (5th Cir. 2017), in support of its "disjunctive" argument. Although the pertinent statutory language (regarding intent) is almost identical, *In re Wiggains* reviewed an avoidance under 11 U.S.C. § 548(a)(1)(A), *not* a discharge determination under § 727(a). Notably, unlike §548(a)(1)(A), which authorizes the trustee to avoid particular transfers of property interests or obligations, §§ 727(a)(2)(A) and (7) yield a complete preclusion of debt relief. *Cf. In re Olivier*, 819 F.2d at 552 (contrasting consequences of § 727(a) and § 523(a)).

17

2. <u>Evidence of "Intent to Defraud"</u>

TGL also challenges the bankruptcy court's finding that Matloff lacked the requisite intent to defraud TGL (a creditor). "[E]vidence of *actual* intent to defraud creditors is required to support a finding sufficient to deny a discharge" pursuant to § 727(a)(2). *In re Chastant*, 873 F.2d at 91 (emphasis added) (quoting *In re Reed,* 700 F.2d at 991). "Constructive intent is insufficient." *Id*. But actual intent "may be inferred from the actions of the debtor and may be proven by circumstantial evidence." *Id*.; *see also In re Reed*, 700 F.2d at 991 ("Because a debtor is unlikely to testify directly that his intent was fraudulent, the courts may deduce fraudulent intent from all the facts and circumstances of a case.").

In support of its position, TGL emphasizes Matloff's decision to transfer funds, on March 1, 2018, from the Charged Accounts (in Asia) to Rooftop USA's (non-charged) Chase bank account (in the United States) and then, after Rooftop Singapore's default, its ceasing to remit collected proceeds to the Charged Accounts (over which TGL had access and control). TGL also highlights Matloff's trial testimony, regarding the March 1, 2018 transfer, wherein he explained that he had been concerned that TGL "would [sweep] all the money,  that "[he] felt [he] had no choice but to breach [the] agreement, and that [he] transferred the money back to the U.S. account to protect it, because [he] was afraid they would somehow freeze the accounts in Asia." ROA.129.

Explaining its determination that Matloff did not act with the necessary "actual intent to defraud," the bankruptcy court referenced additional aspects of Matloff's testimony, which it found credible, regarding his actions, mindset, and thought processes during the relevant time period. In particular, the bankruptcy court emphasized testimony (a) that Matloff had felt compelled—"had no other choice"—to transfer the assets to preserve the

company, which he believed "still had life in it, for the benefit of the creditors, employees, and everyone involved"; (b) that he was hoping to "[protect] the company, pay the emergency bills, and ensure that shipments kept flowing"; (c) that the transfers were done at least in part to benefit and ultimately to pay back TGL "[b]ecause if [TGL] swept the last couple of bucks, that would have been game over for [TGL], too, [because] [Rooftop] would have fallen"; and (d) that that he "was praying every night that [he could] make a deal with [TGL] [and] [m]ore than anything, [he] wanted to pay [TGL] back."[15] The court also reasoned that Rooftop's subsequent transfers to Amax enabled payments of actual manufacturing costs and business expenses necessary for fulfillment of purchase orders.

We are not convinced that the bankruptcy court erred in its assessment of § 727(a)(2)(A)'s application. In reaching this conclusion, several considerations inform our decision. First, in most cases, a denial of the discharge (of debt) otherwise provided by the Bankruptcy Code yields serious consequences for debtors and their creditors. From a bankrupt debtor's perspective, "[i]t is axiomatic that the denial of a debtor's discharge is a harsh remedy[.]" *Neary v. Guillet (In re Guillet)*, 398 B.R. 869, 886 (Bankr. E.D. Tex. 2008); *see also Buckeye Ret. Props. of Ind., L.L.C. v. Tauber (In re Tauber)*, 349 B.R. 540, 545 (Bankr. N.D. Ind. 2006) ("The denial of a debtor's discharge is akin to financial capital punishment [and] is reserved for the most egregious misconduct by a debtor.").[16]

---

[15] Contrary to TGL's suggestion otherwise, it is apparent from this discussion that the bankruptcy court implicitly determined that Matloff's testimonial statements did *not* constitute a candid admission (of actual intent to defraud) rendering consideration of circumstantial evidence unnecessary or inappropriate.

[16] As the Supreme Court has explained:

It is the purpose of the bankrupt act to convert the assets of the bankrupt into cash for distribution among creditors, and then to relieve the honest

No. 24-10439

Consequently, only "very specific and serious infractions" warrant a denial of discharge. *Ichinose v. Homer Nat'l Bank* (*In re Ichinose*), 946 F.2d 1169, 1172 (5th Cir. 1991) ("The discharge provisions require the court to grant the debtor a discharge of all his debts except for very specific and serious infractions on his part." (quoting S. Rep. No. 989, 95th Cong., 2d. Sess. 7 (1978), *reprinted in* 1978 U.S. Code Cong. & Admin. News 5787, 5793)); *see also In re Guillet*, 398 B.R. at 886 ("[T]he provisions set forth in § 727(a) are precisely drawn so as to encompass only those debtors who have not been honest and forthcoming about their affairs.").

Additionally, the exceptions to discharge established by §§ 727(a) and 523(a) "are construed strictly against the creditor and liberally in favor of the debtor." *In re Duncan,* 562 F.3d 688, 695 (5th Cir. 2009) (citing *Hudson v. Raggio & Raggio, Inc.* (*In re Hudson*), 107 F.3d 355, 356 (5th Cir. 1997)); *In re Braziel,* 653 B.R. at 545. And "[t]he creditor 'bears the burden of establishing the elements that would prevent discharge.'" *Laughlin v. Nouveau Body & Tan, L.L.C. (In re Laughlin)*, 602 F.3d 417, 421 (5th Cir. 2010) (quoting *Cadle Co. v. Pratt (In re Pratt)*, 411 F.3d 561, 565 (5th Cir. 2005)) (addressing § 727(a)); *see also Grogan v. Garner*, 498 U.S. 279, 280–81, 286–87 (1991) (addressing § 523).

The rationale for the circumspection reflected in these standards is especially evident in the context of § 727(a) since its discharge exceptions, unlike those in § 523(a), preclude discharge as to *any and all* of the debtor's debts rather than § 523(a)'s selective application to only *particular* debts.

_____

debtor from the weight of oppressive indebtedness, and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes.

*Williams v. U.S. Fid. & Guar. Co.*, 236 U.S. 549, 554–55 (1915).

No. 24-10439

*See, e.g., Rosen v. Bezner*, 996 F.2d 1527, 1531 (3d Cir. 1993) ("Completely denying a debtor his discharge, as opposed to avoiding a transfer or declining to discharge an individual debt pursuant to § 523, is an extreme step and should not be taken lightly."); *cf. Miller v. Wylie (In re Wylie)*, 119 F.4th 1043, 1046 (6th Cir. 2024) ("It would be incongruous if § 727, which carries the extreme penalty of a complete denial of discharge of any debts, required a lesser showing of intent than that required by § 523(a), which prohibits discharge of only certain ones." (citation modified)).

Focusing on § 727(a)(2)(A)—the particular provision at issue—its "specific purpose . . . is to deny a discharge to those debtors who, intending to defraud, transfer property which would have become property of the bankrupt estate." *See In re Chastant*, 873 F.2d at 90; *Swift v. Bank of San Antonio (In re Swift)*, 3 F.3d 929, 931 (5th Cir. 1993) (concluding debtor's transactions immediately prior to filing bankruptcy, which disposed of or encumbered debtor's only nonexempt assets, justified denial of discharge).[17] But, importantly, "[m]ere conversion is not to be considered fraudulent *unless* other evidence proves actual intent to defraud creditors." *In re Reed*, 700 F.2d at 991 (emphasis added); *see also In re Chastant*, 873 F.2d at 91 (requiring evidence of actual intent to defraud).

"Unfortunately, the line between legitimate pre-bankruptcy planning and intent to defraud creditors contrary to section 727(a)(2) is not clear." *In re Swift*, 3 F.3d 929, 931 (5th Cir. 1993). But the debtor's intent "is a finding

---

[17] As we explained in *In re Reed*, 700 F.2d at 992:

It would constitute a perversion of the purposes of the Bankruptcy Code to permit a debtor earning $180,000 a year to convert every one of his major nonexempt assets into sheltered property on the eve of bankruptcy with actual intent to defraud his creditors and then emerge washed clean of future obligation by carefully concocted immersion in bankruptcy waters.

No. 24-10439

of fact." *In re Duncan*, 562 F.3d at 698. And, "[a]s the finder of fact, the bankruptcy court has the primary duty to distinguish" the two. *In re Swift*, 3 F.3d at 931; *see also In re Bowyer*, 932 F.2d at 1101 ("On reflection, we are persuaded that we did not give the bankruptcy court's findings the required deference.").

As a finding of fact, the debtor's intent "is reviewed under the clearly erroneous standard." *In re Duncan*, 562 F.3d at 698. The same is true for the court's determination of the adequacy (or lack thereof) of a debtor's excuse or explanations of omissions or mistakes. *In re Reed*, 700 F.2d at 993. "A factual finding is not clearly erroneous if it is plausible in the light of the record read as a whole." *Baker Hughes Oilfield Operations, Inc. v. Cage (In re Ramba, Inc.)*, 416 F.3d 394, 402 (5th Cir. 2003). Also, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *First Nat'l Bank LaGrange v. Martin (In re Martin)*, 963 F.2d 809, 814 (5th Cir. 1992) (citation omitted).[18] And we "defer[] to the bankruptcy court's determinations of witness credibility." *Saenz v. Gomez (In re Saenz)*, 899 F.3d 384, 392 (5th Cir. 2018); *In re Duncan*, 562 F.3d at 695.

---

[18] A factual finding is clearly erroneous "when[,] although there is evidence to support it, the reviewing court on the entire evidence is left with a firm and definite conviction that a mistake has been committed." *Wilson v. Huffman (In re Missionary Baptist Found. of Am., Inc.)*, 712 F.2d 206, 209 (5th Cir. 1983) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948), *superseded by statute on other grounds*). This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." *Webb v. Reserve Life Ins. Co. (In re Webb)*, 954 F.2d 1102, 1104 (5th Cir. 1992) (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 573–74 (1985)). But the clear error standard does not apply to findings of fact resulting from application of an incorrect legal standard. *See Fabricators, Inc. v. Tech. Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458, 1464 (5th Cir. 1991); *AT&T Universal Card Servs. v. Mercer (In re Mercer)*, 246 F.3d 391, 402 (5th Cir. 2001).

Furthermore, as the bankruptcy court reasoned, "[a] debtor is entitled to take reasonable steps in an attempt to keep his business alive before resorting to bankruptcy protection." *Wash. Mut. Bank, F.A. v. Condit (In re Condit)*, Nos. 02-51179-RLJ-7, 02-51180-RLJ-7, 02-51181-RLJ-7, 03-5008, 03-5010, 03-5011, 2004 Bankr. LEXIS 109, at *34–35 ((Bankr. N.D. Tex. Feb. 6, 2004) (addressing § 727(a)(2)(A) and citing *Womble v. Pher Partners (In re Womble)*, 289 B.R. 836, 855 (Bankr. N.D. Tex. 2003), *aff'd sub nom. Womble v. Pher Partners*, 299 B.R. 810 (N.D. Tex. 2003), *aff'd sub nom. In re Womble*, 108 F. App'x 993 (5th Cir. 2004)). And, where money is transferred "for a legitimate business purpose, the court may not deny discharge on the basis of this transfer." *In re Womble*, 289 B.R. at 854–55 (citing *In re Moreno*, 892 F.2d at 420–21.

Factors relevant to this inquiry include, but are not necessarily limited to: (1) whether the transfer was pursuant to a standard business practice rather than contrived or "forced upon" the other party; (2) whether the transfer was an arm's length transaction and whether the debtor had any negotiating leverage; (3) whether the debtor concealed the transfer; (4) whether the debtor transferred the funds fully voluntarily, or whether the situation effectively forced the transfer upon the debtor; and (5) whether the debtor received proper consideration for the transfer/whether the debtor's creditors benefitted from the transaction. *See In re Moreno*, 892 F.2d at 420–21 (reversing denial of discharge under § 727(a)(2)(A)); *In re Womble*, 289 B.R. at 855 (concluding a transfer made "on the eve of" the debtor's Chapter 13 filing was an "attempt to fraudulently diminish his personal estate knowing he was about to file for bankruptcy—a classic badge of fraud").[19]

---

[19] Our cases have also identified the following (more general) factors as those that may evidence an actual intent to defraud in the context of § 727(a)(2)(A):

No. 24-10439

Considering the bankruptcy court's ruling in light of the foregoing legal principles, we find no clear error in its determination that Matloff lacked "actual intent to defraud." The bankruptcy court found Matloff's explanation of his actions and motivations—reflecting a desire to save the business and, ultimately, repay all of its creditors, including TGL, rather than an attempt to shield assets for his personal benefit and his creditors' detriment—to be credible. We defer to the bankruptcy court's determinations of witness credibility and, in any event, are not left "with a firm and definite conviction that a mistake has been committed" relative to §727(a)(2)(A)'s application. Additionally, though not expressly referenced in the bankruptcy court's opinion, the tenor of Matloff's other email correspondence with TGL executives is consistent with the bankruptcy court's assessment. ROA.8335–50.

3. Injury Requirement

TGL's final argument regarding § 727(a)(2) is its contention that the bankruptcy court erroneously required it to show that it was injured as a result of the challenged transfer of funds from the Charged Accounts. To

---

(1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry.

*In re Chastant*, 873 F.2d at 91 (citation omitted); *see also In re Dennis*, 330 F.3d at 702 (referencing these factors as "tend[ing] to prove actual intent to defraud"); *In re Womble*, 289 B.R. at 853–54 (characterizing these factors as "badges of fraud").

support this assertion, it points to the following statement from the bankruptcy court: "TGL failed to establish . . . that the funds identified as transfers from Rooftop Group USA to Amax were, in fact, proceeds of accounts that had been pledged to TGL." ROA.128.

This argument also lacks merit. It is evident from the record that the statement simply reflects the bankruptcy court's consideration of TGL's "badges of fraud" arguments. It did not impose an additional evidentiary burden not required by law, or otherwise invalidate or infect the bankruptcy court's analysis of whether Matloff had the requisite fraudulent intent.

B. 11 U.S.C. § 727(a)(3) & (a)(7)

Under 11 U.S.C. § 727(a)(3), debt is excepted from discharge if "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case." The objecting creditor "bears the initial burden of production to present evidence" that (1) "the debtor failed to keep adequate records," and (2) the failure made it "impossible to discern [the debtor's] financial status." *In re Duncan*, 562 F.3d at 697 (citing *In re Dennis*, 330 F.3d at 703). "A debtor's financial records need not contain 'full detail,' but 'there should be written evidence' of the debtor's financial condition." *Id.* (quoting *In re Dennis*, 330 F.3d at 703). "The adequacy of the debtor's records is determined on a case by case basis, using such considerations as the 'debtor's occupation, financial structure, education, experience, sophistication and any other circumstances.'" *Id.* (citation omitted).

If the creditor meets its initial burden of production, "the debtor must prove the inadequacy is 'justified under all the circumstances.'" *Id.* (citation omitted). As to each element, "sophisticated debtors may be held to a higher

standard." *Mandel v. White Nile Software, Inc. (In re Mandel)*, No. 20-40026, 2021 WL 3642331, at *6 (5th Cir. Aug. 17, 2021). "The bankruptcy court has wide discretion in analyzing these shifting burdens, and its determination is reviewed for clear error." *In re Duncan*, 562 F.3d at 697 (citation modified).

Evaluating § 727(a)(3)'s application, the bankruptcy court held that TGL had not established that Matloff failed to keep or preserve adequate personal financial records, and that if he had, it was justified. On appeal, TGL raises a litany of arguments for why the bankruptcy court erred. We again emphasize that, "[i]ntertwined with this [court's review] is the basic principle of bankruptcy that exceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start." *Judgment Factors, L.L.C. v. Packer (In re Packer)*, 816 F.3d 87, 91 (5th Cir. 2016) (quoting *In re Hudson*, 107 F.3d at 356); *In re Duncan*, 562 F.3d at 695. We likewise reiterate that application of § 727(a)'s provisions yields a complete denial of discharge to the debtor rather than merely precluding discharge for specific debts.

Considering all of the evidence before it, including TGL's extensive involvement in Rooftop Singapore's financial transactions, and Matloff's longstanding general delegation of business-related financial recordkeeping to various bookkeepers and accountants, the bankruptcy court was not convinced that Matloff had failed to keep adequate records from which his personal financial condition and/or business-related transactions might be ascertained. TGL's assertions of legal error regarding this determination are entirely without merit and urge unwarranted inferences. And TGL's arguments regarding the bankruptcy court's factual findings do not leave us "with a firm and definite conviction that a mistake has been committed" relative to § 727(a)(3). Accordingly, TGL's challenge to the bankruptcy court's § 727(a)(3) assessment of Matloff's personal records fails.

### C. 11 U.S.C. § 523(a)(2)(a)

Our review of the bankruptcy court's rulings regarding the exceptions to discharge found in 11 U.S.C. § 523(a) begins with § 523(a)(2)(A). Under § 523(a)(2)(A), "any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit," is not dischargeable "to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." *See* 11 U.S.C. § 523(a)(2)(A).

TGL argues that § 523(a)(2)(A) renders Matloff's debt non-dischargeable because—it maintains—Matloff falsely represented (in documents signed in 2017 and 2018) that he would repay a $1 million "bonus" (that he had received) in order to induce TGL to extend credit to Rooftop Singapore. The representation in question—a sentence that appears in each of the five Side Letters that Matloff signed on behalf of Rooftop Singapore—states:

> In addition, the bonus paid to DSM in 2017 for 2016 shall be reclassified and treated as a loan from Rooftop to DSM, and DSM shall repay such loan as and when reasonably practicable."[20]

Contending Matloff never actually intended to repay $1 million to Rooftop Singapore, TSG argues that the statement (hereinafter, the "bonus provision") constitutes a "false representation" for purposes of § 523(a)(2)(A). *See Allison v. Roberts (In re Allison)*, 960 F.2d 481, 484 (5th Cir. 1992) ("A promise to perform acts in the future is not considered a qualifying misrepresentation merely because the promise subsequently is breached[,] . . . [but] [a] debtor's misrepresentations of his intentions . . . may

---

[20] *See* ROA.7715, ROA.7764, ROA.7793, ROA.7839, ROA.8047 (Side Letters).

constitute a false representation within the meaning of the dischargeability provision if, when the representation is made, the debtor has no intention of performing as promised.").

After trial, the bankruptcy court rejected TSG's claim, concluding it had "failed to offer adequate credible evidence to satisfy its burden to establish that []Matloff [had] falsely represented that he would repay a $1 million 'bonus' he received" in 2016. *See Triumphant Gold, Ltd. v. Matloff (In re Matloff)*, No. 19-44253-MXM-7, 2022 WL 87925, at *35; ROA.96. In reaching this conclusion, the court first considered the "bonus provision" set forth in the Side Letters, emphasizing that it purports to require the repayment of "'the bonus paid to DSM in 2017 for 2016,' but does not provide any other specificity, such as the date(s) the alleged bonus was paid, or the amount(s) paid." *Id*. at *34. Next, the court considered Matloff's testimony that he, in fact, never actually received a bonus payment in 2017 for a bonus earned in 2016. *Id*. Finding that testimony to be credible and corroborated by tax returns, and reasoning that "credible evidence established that Matloff was not paid a bonus in 2016, 2017, or 2018," the court decided that "any corresponding obligation to repay such a bonus must necessarily not have arisen." *Id*.

The bankruptcy court's analysis then shifted to TGL, concluding that TGL "was not able to establish why it reasonably believed [] Matloff had received a $1 million bonus in either 2016 or 2017, or from what entity such a bonus was allegedly paid." *Id*.; ROA.95. TGL references a "Director's Remuneration" certificate describing $1,085,260 as "total remuneration paid to, *or receivable by* [Matloff] in respect of [his] services" for the year ending on December 31, 2016.[21] *Id*. at *35. However, that document, the

_____

[21] ROA.7574 (TGL Ex. 24) (emphasis added by court).

court reasoned, corroborates that the sum of $1,085,260 was adjusted (in the 2016 Audited Financials) from "due to" to "due from,"[22] but does not specify whether the stated amount was actually paid to Matloff or was merely due and owing to Matloff. *Id.*; ROA.96. Therefore, the court determined, the Director's Remuneration certificate fails to constitute sufficient credible evidence that Matloff was actually paid a bonus of just over $1 million in 2016. *Id.*; ROA.96.

Likewise, during his testimony, TGL's representative, Yee, offered no credible explanation of why he thought Matloff had received a $1 million bonus in 2016 or 2017. Instead, he simply referenced an alleged, unspecified financial record that he did not produce at trial. Additionally, though Yee claimed that the existence of the alleged $1 million bonus was something discovered after the original 2016 Loan Agreement was funded, he had no documents or records that he could offer into evidence that would attest to the source of the alleged $1 million bonus.

Ultimately, the bankruptcy court concluded:

Based on the evidence at trial, TGL cannot be said to have justifiably relied on the alleged promise contained in the bonus provision of the Side Letters[.]

* * *

Based on the [c]ourt's review and analysis of the evidence, the [c]ourt finds and concludes that TGL failed to offer adequate credible evidence to satisfy its burden to establish that []

---

[22] ROA.18833; ROA.18849; ROA.18867.

No. 24-10439

> Matloff falsely represented that he would repay the $1 million "bonus" he received.[23]

On appeal, TGL argues that the bankruptcy court erred in its assessment of § 523(a)(2)(A)'s "reliance" element, contending the court incorrectly required TSG to establish *reasonable* reliance rather than *justifiable* reliance. *See Field v. Mans*, 516 U.S. 59, 61, 74–77 (1995) ("§ 523(a)(2)(A) requires justifiable, but not reasonable, reliance"); *AT&T Universal Card Servs. v. Mercer (In re Mercer)*, 246 F.3d 391, 402 (5th Cir. 2001) (recognizing that the clear error standard does not apply to findings of fact resulting from application of an incorrect legal standard). In support of this argument, TGL points out that the bankruptcy court's "reliance" discussion twice mentions the absence of an investigation, emphasizing that "reasonable reliance" includes an affirmative duty of reasonable investigation whereas "justifiable reliance" generally does not. *See Field*, 516 U.S. at 70–71.[24] Specifically, the bankruptcy court's opinion states:

---

[23] *Triumphant Gold, Ltd. v. Matloff (In re Matloff)*, No. 19-44253-MXM-7, 2022 WL 87925, at *34–35; ROA.95–96.

[24] *See Field*, 516 U.S. at 70–71 ("'[A] person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'" (quoting Restatement (Second) of Torts (1976), § 540)). Justifiable reliance does not require conduct "conform[ing] to the standard of the reasonable man." *Id*. at 71 (quoting Restatement (Second) of Torts (1976), § 545A, Comment *b*.). Rather, it "is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case." *Id* (citation omitted). In other words, justifiable reliance imposes a minimal burden on creditors. A creditor must "use his senses," and cannot "blindly rel[y] upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Id*. at 71 (internal quotation omitted). Likewise, "where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, [the creditor] is required to make an investigation of his own." *Id*. (quoting W. Prosser, Law of Torts § 108, p. 718 (4th ed. 1971)).

The credible evidence suggests that even a minimal investigation by TGL in 2017 would have revealed that Mr. Matloff had not, in fact, actually received an alleged $1 million bonus in 2016 or 2017. Further, there is no credible evidence in the record sufficient to establish that TGL conducted any investigation into the "bonus" issue contemporaneously with the negotiation and execution of the Side Letters that would establish justifiable reliance on the alleged promise that was contained in the Side Letters.

*Triumphant Gold, Ltd. v. Matloff (In re Matloff)*, No. 19-44253-MXM-7, 2022 WL 87925 at *34; ROA.95.

TGL additionally argues that the bankruptcy court erred to the extent that it concluded Matloff had not made a knowingly false representation regarding his intention to repay the bonus in the future. In support of this argument, TGL reiterates the affirmative promise to repay "the bonus" that repeatedly was included in the arm's length, negotiated contractual agreements that Matloff signed, contending those repeated promises themselves constitute knowing factual representations (on which TGL was entitled to rely without further investigation) that Matloff *had* received a "bonus." And those representations were false, TGL contends, as evidenced by Matloff's trial testimony, which TGL characterizes as stating: "[Matloff] believed at the time he signed the agreements that he would not have to repay the funds and that he had no intention of doing so."[25]

TGL's challenges are unavailing. To start, we are not convinced that the bankruptcy court evaluated the reliance element of § 523(a)(2)(A)'s claim using an incorrect legal standard. Indeed, the bankruptcy court's

---

[25] *See* Appellant's Br., ECF 23, p.32; TGL Post-Trial Br., ROA.20108–109 (referencing "[Trial] Day 3 at 45:12–18").

opinion unequivocally and repeatedly references the applicable "justifiable reliance" standard. *See Triumphant Gold, Ltd. v. Matloff (In re Matloff)*, No. 19-44253-MXM-7, 2022 WL 87925 at *29–34; ROA.83, 84, 91, 92, 95. TGL also overstates the significance of court's "investigation" references. When the entirety of the court's analysis is considered, it is apparent that the bankruptcy court did not, in fact, require TGL to have undertaken a "reasonable investigation" to satisfy the reliance element of its claim. Rather, the court's "investigation" comments simply highlight the absence of record evidence supporting TGL's assertion that Matloff actually received a bonus in the amount of $ 1 million in 2016 or 2017.

We likewise are not convinced that the bankruptcy court otherwise erred in its assessment of this claim. In support of this argument, TGL reiterates the affirmative promise to repay "the bonus." We of course recognize that multiple contractual documents signed by Matloff, on behalf of Rooftop Singapore, reference a "bonus paid to DSM in 2017 for 2016" and include a promise to "repay." But, as the bankruptcy court noted, that's all they say. They lack any dollar amount or other information that would reveal the relevant amount. Accordingly, even if we assume, based on those documents, that Matloff did receive some unspecified amount of "bonus" compensation for 2016, TGL has provided zero evidence of that amount. And it certainly has not demonstrated Matloff's receipt of $ 1 million.

Nor does Matloff's trial testimony carry the day for TGL. In its opening brief, TGL proclaims that "Matloff admitted at trial [that] his statement was false when made." To support this assertion, TGL relies on an incomplete—and therefore misleading—excerpt of Matloff's trial testimony.[26] Specifically, TGL states: "Matloff testified he 'imagined when [he] signed

_____

[26] *See* Appellant's Br., ECF 23, p. 38 n.11.

that agreement [he] would not have or should not have to repay the funds.'"[27]

In fact, Matloff actually stated: "[I]t said that the amount can be repaid at some time in the future, but I had imagined when I signed that agreement that I would not or should not have to repay funds *that I never received*." ROA.21282:15-18 (emphasis added). And, moments later, in response to continued questions regarding his repayment intentions, Matloff added: "I signed an agreement *with the intention of doing everything I needed to do*. I did not know how that bonus would play out, because I never received the funds." ROA.21283 (emphasis added). This testimony hardly establishes that Matloff, when signing the 2017 and 2018 Side Letters, had no intention of fulfilling the agreements' future performance obligations. Rather, Matloff's actual testimony appears to simply communicate a logical expectation, i.e., that he would not be required to return (repay) something (money) that he had never been given.

Furthermore, since the bonus provision purports to require the repayment of "the bonus paid to DSM in 2016 for 2017," but does not specify the amount of that bonus, Matloff's understanding of the conditional nature of his repayment obligation is not necessarily inconsistent with the express terms of the bonus provision. In other words, if no bonus was paid, there would be nothing to repay. Or, stated another way, the corresponding repayment obligation likewise would be zero.

In a nutshell, giving due consideration to the limited evidence that TGL chose to present at trial, in contrast with other evidence indicating that no bonus was paid to Matloff, the bankruptcy court's conclusion that TGL

---

[27] *Id.* (citing ROA.21282:8-18; ROA.20108-09).

failed to establish justifiable reliance on the bonus provision was not clearly erroneous.

D. 11 U.S.C. § 523(a)(6).

Under 11 U.S.C. § 523(a)(6), "any debt . . . for willful and malicious injury by the debtor to another entity or to the property of another entity" is excepted from discharge. Based on tort principles, rather than contract, § 523(a)(6) "is designed to compensate the injured party for the injury suffered while not allowing the debtor to escape liability for a 'willful and malicious' injury by resort to the bankruptcy laws." *Friendly Fin. Serv. Mid-City, Inc. v. Modicue (In re Modicue)*, 926 F.2d 452, 453 (5th Cir. 1991); *see also M.C. Oakhill v. Kite (In re Kite)*, No. 18-03010, 2018 WL 6819509, at *5 (Bankr. N.D. Tex. Dec. 26, 2018) ("[A] debtor may not obtain a discharge of debts incurred through his own wrongful conduct." (citing *Grogan*, 498 U.S. at 286)). Hence, "the appropriate measure for non-dischargeability under § 523(a)(6) is an amount equal to the injury caused by the debtor rather than any other sum owed by the debtor on a contractual basis." *In re Modicue*, 926 F.2d at 453; *see also Collins v. Zolnier (In re Zolnier)*, No. 21-20260, 2021 WL 5778461, at *5 (5th Cir. Dec. 6, 2021) ([T]he [debtors'] failure to pay their rent arrearage . . . is not the type of injury § 523(a)(6) is designed to address."); *In re Kite*, 2018 WL 6819509, at *4 ("[T]he proper measure of [§ 523(a)(6)] damages is the injury . . . the [d]ebtor's actions caused [the lender] rather than the balance due [the lender] under the Note.").

"[F]or willfulness and malice to prevent discharge under § 523(a)(6), the debtor must have intended the actual injury that resulted." *State of Tex. By & Through Bd. of Regents of Univ. of Tex. Sys. v. Walker*, 142 F.3d 813, 823 (5th Cir. 1998) (quoting *Corley v. Delaney (In re Delaney)*, 97 F.3d 800, 802 (5th Cir. 1996)). "The test for 'willful and malicious injury' under Section 523(a)(6) . . . is condensed into a single inquiry of whether there exists 'either

No. 24-10439

an objective substantial certainty of harm or a subjective motive to cause harm' on the part of the debtor." *Williams v. IBEW Local 520 (In re Williams)*, 337 F.3d 504, 509 (5th Cir. 2003) (quoting *Miller v. J.D. Abrams, Inc. (In re Miller)*, 156 F.3d 598, 603 (5th Cir. 1998)). "[C]ontractual debts [are excepted] from discharge when those debts result from an intentional or substantially certain injury[.]" *Id.* at 510. Challenging the dismissal of its § 523(a)(6) non-dischargeability claim, TGL argues that the bankruptcy court erroneously determined that Matloff's intentional dissipation of TGL's bargained-for lien rights in its collateral did not constitute a "willful and malicious injury."

TGL's § 523(a)(6) claim is premised on four discrete collections of funds transfers that it alleges constitute "conversions of its collateral" made "willfully and maliciously" and "in express violation of TGL's rights":

> (1) The $846,919.92 Transfers — TGL alleges that "[o]n or about March 1, 2018, Matloff willfully and maliciously transferred $846,919.82 from charged accounts in the names of Asian Express and Rooftop Singapore to Rooftop USA's bank account (a non-charged account) without TGL's consent and in express violation of TGL's rights."[28]

> (2) The $176,000 Transfers —TGL alleges that on March 28, 2018, "Matloff directed the transfer of an additional $176,000 of payments to other creditors or insiders from Rooftop

---

[28] The transactions comprising the $846,919.82 in alleged transfers into Rooftop USA's non-charged bank account, on March 1, 2018, originated from (i) Asian Express in the total amount of $620,818.00, and (ii) Rooftop Singapore in the total amount of $226,101.82. TGL contends that these transfers violated ¶ 7(a)(i) of the January 16, 2018 Side Letter, which purports to "govern the implementation of the receipt of payments for purchase orders assigned or to be assigned to TGL and Polar as security for its financing to Rooftop" and prohibit disbursements of such funds "except pursuant to joint instruction of Rooftop (or its designee) and TGL."

No. 24-10439

Singapore's charged account without TGL's consent, in violation of TGL's rights."

(3) & (4) The $2,074,083.17 and $405,529.62 Transfers

TGL alleges that "[b]etween March 1, 2018, and August 25, 2019, Matloff willfully and maliciously transferred proceeds of purchase orders and receivables not pledged to Star Funding totaling an amount of not less than $2,074,083.17 from Rooftop Group USA's Chase Bank account without TGL's consent, in violation of TGL's rights" and "$405,529.62 from Rooftop Services' Wells Fargo Bank account in violation of TGL's rights."

*Triumphant Gold, Ltd. v. Matloff (In re Matloff)*, No. 19-44253-MXM-7, 2022 WL 87925 at *41; ROA.109–116. TGL argues that the bankruptcy court's evaluation of these transfers is flawed because, it maintains, the court assessed the wrong conduct and employed the wrong legal standard. Specifically, TGL contends, the bankruptcy court's determination of the existence and amount of a § 523(a)(6) "debt" for "willful and malicious injury" is premised—erroneously—on Rooftop Singapore's nonpayment of the balance owed on its loans from TGL and an inaccurate definition of "willful and malicious."

We need not consider the merit of TGL's assertions in order to affirm the bankruptcy court's disposition of the March 1, 2018 transfer of $846,919.82. With respect to that sum, the bankruptcy court determined that TGL had "failed to establish the portion of [that amount], if any, [in which] it had an enforceable interest such that the transfer[] could be construed to violate the terms of the 2017 Loan Agreement or any of the Side Letters." ROA.112. And TGL has not demonstrated clear error in that finding. Accordingly, we are not convinced, on the instant record, that the $846,919.82 transfer actually dissipated TGL's bargained-for lien rights in its collateral. *See, e.g., SE Prop. Holdings, L.L.C., v. Green (In re Green)*, 968 F.3d 516, 522

(5th Cir. 2020) ("Absent competent evidence that [the debtor] was required to distribute the sale proceeds to [the creditor] instead of reinvesting the funds, [the creditor] has not shown that it suffered a [§ 523(a)(6)] harm."); *Cordeiro v. Kirwan (In re Kirwan)*, 558 B.R. 9, 14 (Bankr. D. Mass. 2016) ("[T]o succeed on a claim under . . . § 523(a)(6) on the basis of a fraudulent transfer, the plaintiffs must have an interest in what was transferred, be it a security interest in the property or a judgment setting aside the fraudulent transfer.").

Whether the bankruptcy court properly rejected TGL's contentions relative to the other monetary transfers, however, is not readily apparent. With respect to the $176,000, the bankruptcy court concluded, based on credible evidence, that the transferred funds were for company payroll. And, the bankruptcy court reasoned, "Yee testified that TGL did not object to the payment of the payroll items *per se*; rather, he simply complained that the transfer was "a breach of practice" insofar as the funds were used without TGL's consent." *Triumphant Gold, Ltd. v. Matloff (In re Matloff)*, No. 19-44253-MXM-7, 2022 WL 87925 at *43; ROA.113.

Regarding all of the remaining transfers—the $176,000, the $2,074,083.17, and the $405,529.62—the bankruptcy court additionally explained:

> At trial, TGL failed to offer sufficient credible evidence to suggest the existence of any debt arising from any injury TGL claims to have sustained because of these transfers. Rather, the credible evidence established the existence of only a single debt owing to TGL that arose prior to—and independent of—the alleged breach of contract that may have occurred in connection with disbursements made by Rooftop Group USA or Rooftop Singapore in and after March 2018. Further, the only evidence TGL offered at trial to suggest any injury it sustained from and after February 28, 2018, was Rooftop

> Singapore's failure to pay to TGL the remaining principal balance and other amounts due under the 2017 Loan Agreement.

> TGL offered no credible evidence to support its contention that Mr. Matloff "willfully and maliciously" caused Rooftop Group USA to disburse funds from and after March 1, 2018, when it had disbursed such funds to pay employees, vendors, and other actual operating expenses of the Rooftop business as it had previously been doing in the ordinary course of business.[29]

TGL maintains that the bankruptcy court's analysis of whether TGL's alleged injury "gave rise to the debt that it seeks to except from discharge" overlooks the true basis of TGL's § 523(a)(6) claim. Specifically, TGL argues that the claim is properly "founded squarely on Matloff's impairment and conversion of TGL's security interests[,]" *not* "Matloff's nonpayment of TGL's loan, in and of itself." *See* Appellant's Br., ECF 23, p. 52 n.17 ("nonpayment was *not* TGL's alleged [§ 523(a)(6)] injury") (emphasis in original). In support of its position, TGL reiterates that the $176,000 transfers—albeit for payroll—nevertheless lacked the necessary consent. Regarding the $2,074,083.17, and $405,529.62 transfers, TGL emphasizes Matloff's unauthorized retention of proceeds (from accounts receivable) in Rooftop USA's non-charged bank account for subsequent disbursement—without regard to the parameters set forth in the 2018 Side Letter and TGL's security interests in accounts receivable and proceeds—instead of depositing them, as required, into the Charged Accounts for which

---

[29] *See Triumphant Gold, Ltd. v. Matloff (In re Matloff)*, No. 19-44253-MXM-7, 2022 WL 87925, at *44–45; ROA.115–16.

No. 24-10439

TGL had control and contractual authority to set-off amounts that it was owed.[30]

Additionally, TGL explains that its requested relief is based on the $3.9 million unpaid balance of its loan(s) to Rooftop Singapore, plus interest, simply because that amount, it contends, represents the consequential injury caused by Matloff's dissipation of its secured lien rights—its lost collateral—for that outstanding debt. Specifically, TGL argues that "Matloff converted tens of millions of dollars in collateral proceeds"—resulting in "dissipation of TGL's collateral well in excess of the amount of its debt"—such that judgment in TGL's favor should equal "the amount of unpaid debt that was fully secured on the date of Matloff's willful and malicious breaches of the applicable Agreements, which amount is not less than $8,140,842.02."[31]

---

[30] TGL's post-trial brief explains:

Between March 1, 2018, and August 25, 2019, Rooftop USA continued to collect purchase orders—all of which were pledged to TGL, *see* TGL 73.009—to the tune of $38 million. *See* TGL 160.009. However, the collection of these proceeds was not in accordance with the terms of the January 16, 2018 Side Letter, *i.e.,* into the Charged Accounts pursuant to the Allocation, so that Matloff could avoid TGL's contractual controls over the Charged Accounts through which TGL could have set-off the amounts it was owed as a result of the default. TGL 9.006 ("Upon occurrence of an Event of Default . . . the Lender shall be entitled . . . to (c) apply, set-off or transfer any or all of the Deposit in or towards the payment or other satisfaction of the Secured Obligations"). Thus, by breaching his agreement and removing TGL's collateral from its control, Matloff intended to keep TGL's debt unpaid.

ROA.20079.

[31] The calculation yielding a total of $8,140,842.02 is set forth in TGL's "Addendum to Proof of Claim" (ROA.10720–21); *see also* TGL's Post-Trial Brief, ROA.20063–80.

"Alternatively," TGL urges us to "remand this case to the Bankruptcy Court for findings consistent with the law."[32]

TGL's argument is not without support, and might prevail. Our cases confirm that the "debt" for "willful and malicious injury" addressed in § 523(a)(6) "encompasses the wrongful sale or conversion of encumbered property by the debtor." *In re Modicue*, 926 F.2d at 453; *see also In re Green*, 968 F.3d at 524–25 (recognizing § 523(a)(6)'s application where "the debtor acts in a manner which one knows will place the lender at risk, such as converting property in which the lender holds a security interest" (citation omitted)). And, in that context, "the injury to [the creditor] is the loss of [converted] collateral securing [the debtor's] indebtedness." *In re Modicue*, 926 F.2d at 453; *In re Zolnier*, 2021 WL 5778461, at \*5.

"Therefore, under § 523(a)(6), [the creditor] is entitled to the value of the collateral denied it by [the debtor's] wrongful actions." *In re Modicue*, 926 F.2d at 453; *see also In re Zolnier*, 2021 WL 5778461, at \*5 (the value of converted collateral is excepted from discharge); *In re Kite*, 2018 WL 6819509, at \*5–6 (concluding creditor's § 523(a)(6) damages comprise the decrease in value of collateral). Such collateral includes, *inter alia*, the proceeds of accounts receivable, and mortgage proceeds. *See In re Kite*, 2018 WL 6819509, \*2–6 (mortgage proceeds); *In re Green*, 968 F.3d at 520–24 (receivables of FEMA funds); *Theroux v. HSA Mortg. Co. (In re Theroux)*, 49

---

[32] *See* Appellant's Br., ECF 23, p. 55 (internal citations omitted) ("[D]espite bargained-for security interests and TGL's diligent pursuit of Matloff . . . TGL was left emptyhanded and Matloff's injury to TGL (dissipation of TGL's collateral well in excess of the amount of its debt) . . . should be determined non-dischargeable"); *see also* Reply Br., ECF 29, p.23 (arguing proper measure of damages is the injury the debtor . . . caused to [the creditor's] lien rights—that is, the sum of [the] debt that was left unsecured as a result of [the debtor's] actions").

No. 24-10439

F.3d 728, 1995 WL 103342, at *1, 3–4 (5th Cir. Feb. 27, 1995) (sales proceeds). Finally, "[w]hile the burden of persuasion rests at all times on the creditor objecting to discharge, it is axiomatic that the debtor cannot prevail if he fails to offer credible evidence after the creditor makes a prima facie case." *In re Reed*, 700 F.2d at 992.

Matloff maintains that affirmance is nevertheless warranted because "TGL provided no tracing or similar evidence to show which of the $11,502,271.26 in total disbursements made [between March 1, 2018, and August 25, 2019] [that] it believed represented proceeds of its collateral."[33] Disagreeing, TGL points to trial evidence—testimony and a table—identifying approximately $7 million (of $11.1 million) as accounts receivable collections "Factored to Star" (a preferred lender) and approximately $3.3 million and $2.8 million of "Non-Factored" accounts receivable collections allocated to Asian Express Hong Kong and Rooftop USA, respectively.[34] TGL argues that the "Non-Factored" collections are the collateral of which it was wrongfully deprived.

Unfortunately, we are unable to ascertain, on the instant record, whether and how these particular assertions and data factored into the bankruptcy court's assessment. Nor are we in a position to make an independent determination. In short, an open question exists regarding what amount, if any, of the approximately $3.3 million and $2.8 million sums constitute TGL's converted collateral.

---

[33] *See* Appellee Br., ECF 28, p. 51.

[34] *See* Reply Br., ECF 29, p. 20; Appellant's Br. ECF 23, p. 22 (both citing ROA.9652–56 (TGL Tr. Exh. 160.0002–03); ROA.21284:7-21285:[23]); *see also* ROA.20078–80 (TGL's post-trial brief) (discussing post-March 1, 2018 changes in collections/disbursements procedures).

No. 24-10439

Additionally, as noted above, the bankruptcy court, in rejecting TGL's § 523(a)(6) claim regarding Rooftop Group USA's disbursement of funds from and after March 1, 2018, also reasoned that "it had disbursed such funds to pay employees, vendors, and other actual operating expenses of the Rooftop business as it had previously been doing in the ordinary course of business." *See Triumphant Gold, Ltd. v. Matloff (In re Matloff)*, No. 19-44253-MXM-7, 2022 WL 87925, at *43,45; ROA.112, 115–16. But our cases addressing "willful and malicious injury" (for purposes of § 523(a)(6)) have not recognized a blanket exemption for "ordinary business expenditures," or expenditures made in hopes of keeping a failing business. Instead, the relevant inquiry is "whether there exists 'either an objective substantial certainty of harm or a subjective motive to cause harm' on the part of the debtor." *In re Williams*, 337 F.3d at 509.[35]

------

[35] In the list of elements that Matloff must establish to prevail under § 523(a)(6), the bankruptcy court includes, without citation of authority: "the injury was not sufficiently justified under the circumstances to render it not willful and malicious." *See Triumphant Gold, Ltd. v. Matloff (In re Matloff)*, No. 19-44253-MXM-7, 2022 WL 87925, at *41; ROA.108. Citing our decision in *In re Miller*, TGL argues "willful and malicious injury" excludes a "just cause or excuse approach" because "[w]here injury is intentional . . . it cannot be justified or excused." *See* Appellant's Br., ECF 23, p. 42; *In re Miller*, 156 F.3d at 606 ("Where injury is intentional, as it now must be under *Kawaauhau* [*v. Geiger*, 523 U.S. 57, 61–64 (1998)], it cannot be justified or excused. Eliminating the 'just cause or excuse' exception would not ensnare those who have acted under 'an honest, but mistaken belief.'"); *see also In re Green*, 968 F.3d at 524–25) ("We may infer that a debtor acted with malice, for purposes of § 523(a)(6), if the debtor acts in a manner which one knows will place the lender at risk, such as converting property in which the lender holds a security interest." (internal quotation omitted)).

In response, Matloff argues that the "bankruptcy court's consideration of whether any alleged injury 'was not sufficiently justified under the circumstances' was squarely consistent with Fifth Circuit jurisprudence," and cites our decision in *Berry v. Vollbracht (In re Vollbracht)*, 276 F. App'x 360, 362 (5th Cir. 2007). In *In re Vollbracht*, the bankruptcy court considered whether the debtor's physical assault of another was justified on grounds of self-defense or at least whether his intentional punches, which were objectively very likely to cause harm, were rendered less culpable given the injured party's actions.

No. 24-10439

Indeed, in *In re Theroux*, 1995 WL 103342, § 523(a)(6) precluded discharge of debt arising from the debtor's failure to remit collateral (proceeds from product sales) to the lender (as required by the finance agreement) notwithstanding that the debtor, who was having cash flow problems, had used the sales proceeds to pay its "general creditors in lieu of remitting the proceeds directly to [the lender]," *Id.* at *1, 3. Notably, *Theroux* distinguished the bankruptcy court's decision in *In re Grier*, which granted discharge—despite the debtor's use of sale proceeds to pay other creditors (rather than the secured inventory financier) in hopes that ongoing business eventually would generate enough money to repay the financier—"because the [*Grier*] lender had acquiesced to [the debtor's] conduct through course of dealing." *Id.* at *3 (citing *Am. Honda Fin. Corp. v. Grier (In re Grier)*, 124 B.R. 229, 234 (Bankr. W.D. Tex. 1991)).

And in *In re Green*, we reversed, in part, a summary judgment rendered in the debtor's favor, relative to the debtor's company's use of encumbered receivables for further disaster-relief work, because the creditor demonstrated the existence of a genuine dispute of material fact regarding whether the creditor actually had "consented to [the debtor's] use [of the proceeds] to pay such things as payroll, taxes, insurance [and] fuel . . . in the

---

Reasoning that "an injury levied as a legitimate response to someone else's actions . . . cannot be 'willful and malicious' under § 523(a)(6)," we held that "our two-part test must countenance the actions of the injured party." *In re Vollbracht*, 276 F. App'x at 362. Thus, on remand, the bankruptcy court was to consider whether the injury there was "sufficiently justified under the circumstances to render it not 'willful and malicious.'" *Id.*

*In re Vollbracht* addressed situations in which the "actions of the injured party" are relevant to the "willful and malicious" inquiry. *Id.* (emphasis added). Here, however, no such situation has been alleged, must less established, to exist. And, to date, we have not extended *In re Vollbracht*'s additional, fact-specific "not sufficiently justified under the circumstances" inquiry beyond situations involving physical attack.

ordinary course of business." 968 F.3d at 522–24. In other words, § 523(a)(6)'s possible application in *In re Green* depended on the creditor's (disputed) consent, *not* whether the arguably unauthorized disbursements were for other ordinary business expenses.

On the instant record, we cannot be certain that the bankruptcy court properly incorporated these legal principles into its analysis of TGL's § 523(a)(6) claim. Here, TGL's lack of consent to the $176,000, $2,074,083.17, and $405,529.62 transfers apparently is undisputed. The same seemingly is true of the approximately $3.3 million and $2.8 million of "Non-Factored" accounts receivable collections allocated to Asian Express Hong Kong and Rooftop USA for such expenditures. Furthermore, with the exception of the $176,000 sum, it is not as if Rooftop Singapore merely disbursed secured proceeds from the Charged Accounts without first seeking TGL's approval, or even in excess of the "Allocation" provision of the January 16, 2018 Side Letter. Instead, Rooftop Singapore, at Matloff's direction, purposely stopped its required depositing of business proceeds into the Charged Accounts in order to ensure that those funds remained available for Rooftop's use. ROA.21283–87. And, eventually, Matloff terminated TGL's "read only" access to Rooftop's non-charged accounts. ROA.21399; ROA.21779; ROA.21792.

## V.

As stated herein, we are unable to determine, on the instant record, whether, for purposes of 11 U.S.C. § 523(a)(6), Debtor-Appellee Matloff willfully and maliciously caused Appellant TGL, a creditor, to be deprived of certain collateral totaling approximately $6 million. Otherwise, we ascertain no error in the bankruptcy court's rejection of Appellant TGL's non-dischargeability claims. Accordingly, we AFFIRM IN PART and VACATE and REMAND IN PART for further proceedings consistent with this opinion.

No. 24-10439

ANDREW S. OLDHAM, *Circuit Judge*, concurring in part and dissenting in part:

I join the majority's thorough opinion except insofar as it vacates the district court's judgment on the 11 U.S.C. § 523(a)(6) claim. I would affirm in full rather than risk subjecting Matloff to the "death penalty of bankruptcy." *In re Hudson*, 420 B.R. 73, 100 (Bankr. N.D.N.Y. 2009).

After a bench trial, the bankruptcy court found that Matloff did not willfully and maliciously injure TGL. *See* ROA.107, 112, 114, 116; *see also* 11 U.S.C. § 523(a)(6). That is a finding of fact (on which TGL bore the burden of proof). *See In re Zolnier*, No. 21-20260, 2021 WL 5778461, at *4 (5th Cir. Dec. 6, 2021). So we can vacate or reverse only if that finding was clearly erroneous. *See In re Cowin*, 864 F.3d 344, 349 (5th Cir. 2017). Moreover, it is a "basic principle of bankruptcy that exceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start." *In re Packer*, 816 F.3d 87, 91 (5th Cir. 2016) (quotation omitted). TGL thus faces a very heavy burden on appeal. And on this record, I do not think TGL has met it.

I

Converting property in which a lender has a security interest does not automatically establish a willful and malicious injury to the lender. *See State of Tex. By & Through Bd. of Regents of Univ. of Tex. Sys. v. Walker*, 142 F.3d 813, 824 (5th Cir. 1998) ("[A] willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances."); *accord Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 332 (1934) (same); *see also* 4 COLLIER ON BANKRUPTCY ¶ 76.09 ("A conversion of property may be willful and malicious or not depending upon the circumstances.").

No. 24-10439

None of our cases casts doubt on that principle. Two of our precedents say that we "may infer" a willful and malicious injury from such conduct. *In re Green*, 968 F.3d 516, 524–25 (5th Cir. 2020); *see also In re Theroux*, No. 94-50530, 1995 WL 103342, at *3 (5th Cir. Feb. 27, 1995). But they do not suggest we *must*. Two other cases say that a willful and malicious injury "encompasses the wrongful sale or conversion of encumbered property by the debtor." *In re Zolnier*, 2021 WL 5778461, at *4; *see also In re Modicue*, 926 F.2d 452, 453 (5th Cir. 1991). But those cases only concern the *wrongful* transfer of encumbered collateral—not *all* transfers of encumbered collateral.

Moreover, we have never held that a bankruptcy court clearly erred in finding no willful and malicious injury despite the debtor's conversion of collateral. The court in *Green* held only that summary judgment should have been denied. *See* 968 F.3d at 524–25. In *Theroux*, this court held that the bankruptcy court's finding of willful and malicious injury was not clearly erroneous. *See* 1995 WL 103342, at *3. In *Modicue*, we did not even address the bankruptcy court's finding of willful and malicious injury. *See* 926 F.2d at 453. Finally, in *Zolnier*, this court simply held that the bankruptcy court clearly erred in finding that one business partner did not commit a willful and malicious injury because he "actively participated in" the same conduct as another partner that willfully and maliciously injured the creditor. *See* 2021 WL 5778461, at *4. So none of our previous cases addressed the issue here: whether the bankruptcy court clearly erred in finding no willful and malicious injury when the debtor converted the creditor's collateral.

II

Turning to that question, the bankruptcy court did not clearly err because Matloff's conduct was arguably not wrongful. Under Supreme Court precedent, "[t]here may be a conversion which is innocent or technical, an

46

unauthorized assumption of dominion without willfulness or malice. There may be an honest but mistaken belief" that the act was permissible. *Davis*, 293 U.S. at 332. Thus, "a conversion which is innocent or technical is not willful," and "a conversion which is committed under an honest or mistaken belief that it is not wrongful is not malicious." 4 Collier on Bankruptcy ¶ 76.09.

True, Matloff intentionally converted TGL's collateral. But he did not intend to cause TGL harm. Matloff did not engage in self-dealing; rather, he used the funds to "insure that the emergency bills get paid first and foremost as our ability to continue operating is absolutely necessary if we are to meet our fiduciary obligations to all of our creditors." ROA.112; *see also* ROA.114, 115–16. Matloff "testified credibly that he did not believe he was harming TGL's interests by executing the fund transfers," as he was only trying to "protect the company, pay the emergency bills, [and] make sure the shipments [kept] flowing. And [he] was praying every night that [he could] make a deal with TGL." ROA.112; *see also* ROA.114, 115–16. In the face of complete financial collapse, Matloff's business judgment was not obviously wrong. So unlike the debtor in *Zolnier*, who "understood it was wrong to convert the collateral," 2021 WL 5778461, at 4, Matloff honestly and reasonably believed that his transfers were not wrongful and that they would financially benefit TGL. And to use the language of this court's test, it is not *clear* that there was an objective substantial certainty of harm or a subjective motive to cause harm under these circumstances. So I would not upset the bankruptcy court's factual finding.

In response, the majority suggests, but does not hold, that the bankruptcy court clearly erred. It points to two cases that focus on whether the creditor consented to or acquiesced in the debtor's conduct. *See ante*, at 42 (discussing *Theroux* and *Green*). But in both cases, consent was a key issue only because of the debtors' litigation decisions and the procedural posture,

not because consent is the only relevant question when a debtor transfers collateral. In *Green*, the debtor moved for summary judgment, so he had to prove that no rational juror could ever find in the creditor's favor. *See* 968 F.3d at 519. If the creditor consented, of course no willful and malicious injury could have occurred. Without consent, the issue was ripe for trial because it could have gone either way. And in *Theroux* (an unpublished decision), the debtor argued that the bankruptcy court clearly erred in finding a willful and malicious injury. *See* 1995 WL 103342, at *3. The creditor's consent would have established a clear error on the bankruptcy court's part. Without consent, the issue could have gone either way and thus there would have been no *clear* error.

Here, however, we are not considering a motion for summary judgment. Instead, we are considering what the bankruptcy court found after a trial. And after that trial, the bankruptcy court found that Matloff inflicted no willful and malicious injury on TGL. And because Matloff's actions were arguably not wrongful, the bankruptcy court could have decided either way regardless of whether TGL consented. So the bankruptcy court's finding was "plausible in light of the record as a whole." *Future Proof Brands, LLC v. Molson Coors Beverage Co.*, 982 F.3d 280, 288 (5th Cir. 2020) (quotation omitted). I would not second guess the bankruptcy court and risk sentencing Matloff to financial death.

I respectfully dissent.